**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 94-30726
_____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,
                    Cross-Appellant,

versus

EARL W. KRENNING, RICHARD P. RUSHTON,
and STEVEN L. SCHMITTZEHE,

                    Defendants-Appellants,
                    Cross-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

August 22, 1996

Before REAVLEY, KING, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants Earl W. Krenning, Richard P. Rushton, and Steven L. Schmittzehe appeal their convictions for multiple counts of mail fraud and for conspiracy to commit mail fraud. The Government appeals the sentences imposed by the district court. We affirm the Defendants' convictions, vacate their sentences, and remand for resentencing.

I

In late 1987, Krenning and a group of investors formed a new Louisiana insurance company called Sovereign Fire and Casualty Insurance Company ("Sovereign Insurance"). The investors also set up a holding company, Sovereign Holding, Inc., which owned 100% of the stock in Sovereign Insurance. The Commissioner of Insurance at that time required a new domestic casualty insurance company to have an initial reserve surplus of $1,500,000. In return for a contribution of certain assets from a prior company and $150,000 cash, Krenning received a twenty-five percent interest in the holding company, equal in value to $500,000. Krenning also allowed one of the investors, Robert Dutschke, to contribute, in lieu of cash, a building whose stated value, $685,000, was greatly exaggerated.[1] Finally, in order to obtain the certificate of authority to operate an insurance company from the Commissioner of Insurance, who retained discretion to deny an application even after the $1,500,000 minimum had been met, Krenning delivered to the Commissioner's home in New Orleans an envelope containing $10,000 in cash.[2] The Commissioner of Insurance signed the certificate of authority four days later.

Sovereign Insurance began operating in early 1988, with

---

[1] In fact, the building had no net equity value once the mortgages were subtracted from its true value. Dutschke was convicted of conspiracy and mail fraud in March of 1995.

[2] In an attempt to cover up the obvious bribe, Krenning later submitted a letter to the Deputy Commissioner falsely naming a number of individuals who supposedly contributed portions of the $10,000 to the Insurance Commissioner's campaign fund.

Krenning as president and chief executive officer. Rushton was a senior financial officer and headed up the claims department. The company sold primarily "10/20/10" automobile insurance, which was the minimum liability insurance required under Louisiana law. From the beginning, there was considerable internal dissention between Krenning and his fellow investors regarding the running of the company. Sovereign Insurance's performance suffered, and the company's inability to maintain adequate reserves meant that it would soon not be permitted to sell further insurance policies. By the end of 1988, the shareholders in Sovereign Holding had reached a consensus that Krenning should be forced to resign. Instead, Krenning and two other shareholders, including Rushton, offered to purchase the entirety of the dissatisfied shareholders' stock and debentures for roughly $1,500,000. After an initial attempt to purchase the stock using stolen bank drafts, Krenning eventually successfully executed the transaction using approximately $900,000 of Sovereign Insurance's own funds.

Having depleted the company's reserve fund, Krenning and Rushton immediately began to experience difficulties in making timely claims payments. At this time, Sovereign Insurance had close to a $1 million reserve deficiency which needed to be addressed before the annual statement was prepared as of the year's end. Without an adequate reserve surplus, the Commissioner of Insurance would soon take control of the company and shut it down. Accordingly, Krenning and Rushton carried out the first of several

-3-

schemes designed to place worthless or overvalued assets on the books of Sovereign Insurance in order to conceal the deficiency from the Department of Insurance, and thereby continue to operate as an insurance company.

In what became known as the "Falcon Pipeline Deal," a promissory note was executed indicating that Sovereign Insurance loaned Falcon Pipeline Company, Inc. ("Falcon") $500,000, although no loan was actually made. The loan was collateralized by a mortgage on a pipeline owned by Falcon and valued by Krenning and Rushton on Sovereign Insurance's quarterly and annual financial statement at over $750,000. The pipeline had not been in use since 1984, and the estimated salvage value of the pipeline and attached easements, leases, compressors and dehydration facility was put at $18,000. At the same time, Falcon purchased a two-year 9% debenture note from Sovereign Holdings on basically the same terms and conditions as the promissory note between Falcon and Sovereign Insurance.

A side agreement was created between Sovereign Insurance and Falcon which indicates the true nature of the transaction between the parties. Falcon paid Sovereign Holdings nothing for the debenture note. Instead, Sovereign Holding made two monthly payments to Falcon. The first, an interest payment, was immediately retransmitted from Falcon to Sovereign Insurance under

the first loan agreement.[3] The second, a $5,000 monthly management fee, was retained by Falcon as its payment for the insurance company's use of the pipeline asset. In essence, Sovereign Insurance "rented" the asset from Falcon. The debt appeared only on Sovereign Holding's balance sheet, while Sovereign Insurance was able to show an asset, falsely valued at $500,000. The side agreement also provided that the pipeline mortgaged to Sovereign Insurance under the first loan agreement was not at risk if the insurance company should become impaired or insolvent. Finally, the entire series of transactions were then backdated to December of 1988, in order to allow Sovereign Insurance to claim the asset on its 1988 annual statement to the Commissioner of Insurance.[4]

Before Sovereign Insurance was finally liquidated in May of 1991, several similar deals were executed placing overvalued or nonexistent assets on the books of Sovereign Insurance. All of these subsequent deals took place after Schmittzehe joined Sovereign Insurance in April of 1989 as comptroller and, later, as treasurer. The "Marble Falls Deal" involved the "renting" of a $450,000 mortgage secured by a convention center in Arkansas, the appraisal value of which, $1.9 million, was based on conditions which were never fulfilled. Here too a side agreement was executed

---

[3]     Sovereign Holding also made principal payments to Falcon four times a year, which were similarly retransmitted to Sovereign Insurance under the first loan agreement.

[4]     There was also evidence that the 1988 annual statement was manipulated to further obscure the reserve deficiency.

explaining the true nature of the transaction, and assurances were given that the property was not at risk in the event of foreclosure on the underlying note. As the situation grew more dire, the Defendants resorted to listing four mortgage-backed debenture notes totalling $1.28 million (the "Torrey Deal"). Although the Torrey Deal was in fact never completed, the Defendants specifically stated on the 1990 annual statement that it had been "consummated." The Defendants also listed four short-term promissory notes supposedly collateralized by Bay Agency/Sunbelt property, totalling $720,000. These notes, which had no real economic substance, were backdated for purposes of listing them on the 1990 annual statement, and were then later canceled by Schmittzehe. In this manner Sovereign Insurance continued to operate, selling insurance policies until the company finally collapsed in May of 1991. Several thousand unpaid claims totalling an estimated $9 million remained unpaid following the liquidation of Sovereign Insurance.

A grand jury issued a fifteen count indictment charging Krenning, Rushton, Schmittzehe, Robert V. Bishop, Sr., and George C. Cavin, Jr., with mail fraud, in violation of 18 U.S.C. § 1341 (counts one through thirteen); and with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371 (count fifteen).[5] A jury returned a verdict of guilty as to Krenning, Rushton, and

---

[5] Count fourteen charged all the defendants except for Cavin with money laundering, in violation of 18 U.S.C. § 1957, and was dismissed shortly before trial.

-6-

Schmittzehe on all counts. Bishop and Cavin were acquitted on all counts. Krenning received a sentence of seventy-one months, and was ordered to pay $100,000 in restitution. Schmittzehe received a sentence of thirty-seven months, and was ordered to pay $50,000 in restitution. Rushton received a sentence of forty-six months, and was ordered to pay $10,000 in restitution. All defendants filed timely notices of appeal. The Government also filed a timely notice of appeal, alleging errors in sentencing.

## II

All three Defendants challenge their convictions on sufficiency of the evidence grounds. Accordingly, we must determine "whether, after viewing the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the prosecution, any reasonably minded jury could have found that the defendant was guilty beyond a reasonable doubt." *United States v. Leahy*, 82 F.3d 624, 633 (5th Cir. 1996) (internal quotation marks omitted). The evidence need not exclude every reasonable theory of innocence or be entirely inconsistent with every conclusion except that of guilt. *Id.* If a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt based on the evidence presented at trial, we will affirm the conviction. *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991); *United States v. Triplett*, 922 F.2d 1174, 1177 (5th Cir.), *cert. denied*, 500 U.S. 945, 111 S. Ct. 2245, 114 L. Ed. 2d 486

(1991).

A

Krenning contends that there was insufficient evidence to support his convictions for mail fraud and conspiracy to commit mail fraud. A conviction for conspiracy under 18 U.S.C. § 371 requires the Government to prove beyond a reasonable doubt (1) an agreement between two or more persons, (2) to commit a crime against the United States, and (3) an overt act in furtherance of the agreement committed by one of the conspirators. *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994). A conviction for mail fraud under 18 U.S.C. § 1341 requires the Government to prove beyond a reasonable doubt (1) a scheme to defraud, (2) which involved use of the mails, and (3) that the mails were used for the purpose of executing the scheme. *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir. 1994). Each use of the mails to further a scheme to defraud constitutes a separate offense under the statute. *Id.*

Krenning concedes that there was sufficient evidence presented at trial from which a reasonable jury could find beyond a reasonable doubt that he participated in a scheme to defraud and that he had the specific intent to commit fraud. Krenning argues, however, that there was no evidence that the mailings were made for the purpose of executing the scheme to defraud because the jury never had the opportunity to actually read the mailings which

-8-

formed the basis for the mail fraud conviction. We find no merit to this argument.

All the parties stipulated at trial that the mailings described in counts one through thirteen of the indictment did occur on or about the dates indicated therein.[6] The indictment stated that the Defendants caused to be mailed "insurance policies, applications, finance agreements, claims, premium payments, premium deposits, and insurance related materials" to the thirteen individuals listed in counts one through thirteen.[7] These documents were essential to Sovereign Insurance's task of selling insurance. By "renting" overvalued assets and reporting them on the annual statements to the Commissioner of Insurance, the Defendants were able to disguise the insolvent nature of their insurance company. Without these mailings to the insureds, however, the Defendants would equally not have been able to continue selling worthless insurance policies, the financial object of their scheme.[8] Accordingly, we conclude that there was

---

[6] The parties further stipulated that the individuals named in counts one through eight and ten through thirteen were policy holders with Sovereign Insurance, and that claims submitted by those policyholders to Sovereign Insurance remained unpaid.

[7] *See United States v. Green,* 494 F.2d 820, 824 (5th Cir.) ("One 'causes' the mails to be used when one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . .") (internal citation and quotation marks omitted), *cert. denied*, 419 U.S. 1004, 95 S. Ct. 325, 42 L. Ed. 2d 280 (1974).

[8] *See Pereira v. United States*, 347 U.S. 1, 8, 74 S. Ct. 358, 363, 98 L. Ed. 435 (1954) (holding that the mailing element is satisfied by a mailing which is "incident to an essential part of the scheme").

sufficient evidence for the jury to conclude that the mailings in counts one through thirteen were in furtherance of the Defendants' scheme to defraud.

Alternatively, Krenning argues that these mailings fall within the "innocent mailings" or "statutory duty" exception to the mail fraud statute first recognized by the Supreme Court in *Parr v. United States*, 363 U.S. 370, 80 S. Ct. 1171, 4 L. Ed. 2d 1277 (1960). There is no general rule that innocent or routine mailings cannot supply the mailing element under the statute. *Schmuck v. United States*, 489 U.S. 705, 714-15, 109 S. Ct. 1443, 1450, 103 L. E. 2d 734 (1989). Rather, the exception in *Parr* applies only where the mailings are both not themselves false or fraudulent, and their mailing is required by law. *United States v. Curry*, 681 F.2d 406, 412 (5th Cir. 1982). *Parr* involved the mailing of legitimate tax notices and receipt of tax payments by a Texas school board engaged in embezzling some of the tax money collected by the school district. The Supreme Court reversed the defendants' mail fraud convictions based on these mailings, in part because the defendants were required by state law to cause the tax related mailings. *Parr*, 363 U.S. at 390-91, 80 S. Ct. at 1183-84.

This Court has previously noted, however, that in *Parr* the tax mailings would have occurred irrespective of the defendants' scheme to embezzle the school district's money. *United States v. Bright*, 588 F.2d 504, 509 (5th Cir.), *cert. denied*, 440 U.S. 972, 99 S. Ct.

-10-

1537, 59 L. Ed. 2d 789 (1979). In *Bright,* we concluded that the "innocent mailings" exception does not apply where the legal requirement to make the mailings is triggered by the fraudulent scheme. *See id.* at 509-10 ("If [the defendants] had not decided to defraud the estate of their late cousin, they would not have had to comply with the state law requiring them to file the creditors' notice."); *see also Schmuck*, 489 U.S. at 713 n.7, 109 S. Ct. at 1449 n.7 (distinguishing *Parr* by noting that the mailing of the tax documents "would have been made regardless of the defendants' fraudulent scheme," whereas the mailings at issue were "derivative" of Schmuck's fraudulent scheme and "would not have occurred but for that scheme").

Even assuming there existed a statute requiring Sovereign Insurance to mail the policies and related documents to the insureds, we conclude that none of the mailings would have occurred but for the Defendants' scheme to fraudulently disguise the insurance company's reserve deficiency. Absent this scheme, Sovereign Insurance would have been shut down by the Commissioner as early as the beginning of 1989. The continuing need to mail policies out to new customers was therefore entirely derivative of the Defendants' decision to fraudulently operate an insolvent insurance company. Accordingly, we find that the "innocent mailings" exception to the mail fraud statute does not apply to the Defendants' conduct. Having reviewed the record, we conclude that

-11-

there was sufficient evidence from which a reasonable jury could have found Krenning guilty of mail fraud and conspiracy to commit mail fraud.

B

Rushton argues that there was insufficient evidence to establish that he had the requisite intent under both the conspiracy and substantive mail fraud counts. A conviction for conspiracy under 18 U.S.C. § 371 requires that the Government prove beyond a reasonable doubt that "the defendant knew about the conspiracy and that he voluntarily became part of it." *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994) (internal quotation marks omitted). The Government may prove the conspiracy through circumstantial evidence, and the agreement need not be formal or spoken. *Id.* The Government must do more, however, than merely "pile inference upon inference upon which to base the conspiracy charge." *Id.* (internal quotation marks omitted). Likewise, the mail fraud conviction requires that the Government prove "not only that there was fraudulent activity but also that the defendant had a conscious knowing intent to defraud." *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) (internal quotation marks omitted).

Evidence presented at trial established that Rushton participated in the formation of Sovereign Insurance and was involved in the buy out of the dissatisfied investors which led to

the insurance company's insolvency. Rushton warned the investors that Krenning was trying to use the company's own money to buy them out, and yet he later joined Krenning in the buy out and signed documents detailing the true nature of the transaction. As corporate secretary for both Sovereign Holdings and Sovereign Insurance, Rushton signed the debenture note given to Falcon, as well as several checks making payment of the debt service and management fees. Rushton also signed the 1988 annual statement listing the falsely inflated Falcon Pipeline mortgage.

The evidence also established that in April of 1989, Rushton requested a real estate appraisal for the Dutschke building, which has been listed on the 1988 annual statement as having a gross value of $685,000 and a net equity value of $250,000. The appraisal, sent to Rushton the following month, valued the Dutschke building at $305,000, which meant that it had no net equity value. Nonetheless, Rushton continued to sign quarterly statements and the 1989 annual statement declaring the Dutschke building to have a net equity value of $250,000.

Finally, Rushton was an active participant in the Torrey Deal; his sale of stock and his signature on the documents were required to complete the deal. Even though the documents were never signed, and the deal was never completed, Rushton signed the 1990 annual statement to the Commissioner of Insurance attesting that the Torrey Deal had been completed and listing related mortgages totalling $1.28 million. In May of 1991, Rushton signed an amended

1990 annual statement removing the Torrey mortgages.

Based on this evidence, we find that Rushton's involvement in the fraud conspiracy is neither so slight nor so tenuous as to make unreasonable an inference of knowing complicity. Accordingly, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Rushton knew about the conspiracy and voluntarily became a part of it. We also conclude that there was sufficient evidence from which a reasonable jury could find that Rushton had a conscious knowing intent to defraud.

C

Schmittzehe contends that there was insufficient evidence to support his convictions for mail fraud and conspiracy to commit mail fraud. Once the Government has produced evidence of an illegal conspiracy, "it need only introduce 'slight evidence' to connect an individual defendant to the common scheme." *United States v. Leahy*, 82 F.3d 624, 633-34 (5th Cir. 1996) (internal quotation marks omitted); *United States v. Duncan*, 919 F.2d 981, 991 (5th Cir. 1990), *cert. denied*, 500 U.S. 926, 111 S. Ct. 2036, 114 L. Ed. 2d 121 (1991). The evidence, however, must be sufficient for a reasonable jury to infer that the defendant knew about the conspiracy and voluntarily agreed to join. *Duncan*, 919 F.2d at 991.

Schmittzehe, who was a CPA, joined Sovereign Insurance in April of 1989 as its comptroller; by the filing of the September

-14-

1989 quarterly statement, he was acting as treasurer, a position he maintained until the insurance company was liquidated. In the middle of May that year, Schmittzehe signed, as assistant treasurer, the March 31, 1989 quarterly statement declaring the Falcon Pipeline to be valued at $750,000. He also signed as treasurer the 1989 and 1990 annual statements listing the Falcon Pipeline mortgage as a valid asset.

Schmittzehe was the sole representative of Sovereign Holdings and Sovereign Insurance present at the closing of the Marble Falls Deal in July of 1989. During the closing, Schmittzehe affirmed to John Nielsen, whose company owned the Marble Falls mortgaged property, that the debenture would offset the note and mortgage held by Sovereign Insurance if Sovereign Holdings stopped paying, and that therefore the property was not at risk of foreclosure.[9] The Government also submitted a letter and some handwritten notes written by Schmittzehe which established that he was intimately familiar with the structure and purpose of these "renting"

---

[9] Nielsen had also insisted that an additional paragraph to this effect be inserted in the mortgage agreement:

> It is understood and agreed that upon termination of this agreement and tender of Sovereign Holdings, Inc.'s 10 (ten) year 12% (twelve per cent) [sic] Debenture by Marble Falls Resort and Campground, Inc., Sovereign Holdings, Inc. shall satisfy the debt of Marble Falls Resort and Campground, Inc. then owing to Sovereign Fire and Casualty Insurance Company and cause the release of any property securing said debt.

At the closing, Schmittzehe signed the mortgage agreement on behalf of Sovereign Holdings. Although the closing took place during the first week of July, the documents were all backdated to June 30, 1989.

transactions.[10]  In reviewing the proposed documents for the Torrey

Deal, Schmittzehe noted several problems, including the fact that

Sovereign Insurance's legal counsel was uncomfortable giving any

legal opinion regarding the transaction since he had knowledge of

potential backdating of documents and felt such conduct could be an

ethics violation.  Schmittzehe's suggested "Remedy" was: "Get rid

of all these requirements, get an unethical lawyer, or get a lawyer

who doesn't know the entire transaction."[11]  Finally, Schmittzehe

also signed the 1990 annual return listing the Torrey Deal

mortgages as "consummated" even though the deal was never

completed.

Viewing the record in the light most favorable to the jury

verdict, we find that there is ample evidence from which a

reasonable jury could infer that Schmittzehe knew about the

---

[10]    The letter concluded, "The net result of this transaction was to create $400,000 of additional capital in the insurance company without requiring additional funds."

[11]    Schmittzehe argues that the district court erred in admitting his handwritten notes regarding problems with the proposed Torrey Deal documents. We review a district court's decision that evidence is relevant and admissible for abuse of discretion. *United States v. Castillo*, 77 F.3d 1480, 1496 (5th Cir. 1996). In addition to the problem of Sovereign Insurance's legal counsel feeling uncomfortable giving legal opinions regarding the transaction, the notes also address various other aspects of the initial debenture purchase agreement, including the fact that, as drafted, it did not maintain the fiction that the Torrey Deal consisted of separate agreements.  The district court concluded that the handwritten notes were admissible to demonstrate Schmittzehe's state of mind, that is, his specific intent to defraud.  The district court also concluded that the evidence was relevant to rebut Schmittzehe's defense that he relied on advice of counsel.  We agree.  *See, e.g., United States v. Cohen*, 544 F.2d 781, 786 (5th Cir.) (concluding letter was admissible to show state of mind), *cert. denied*, 431 U.S. 914, 97 S. Ct. 2175, 53 L. Ed. 2d 224 (1977); *United States v. Baumgarten*, 517 F.2d 1020, 1027-28 (8th Cir.) (same), *cert. denied*, 423 U.S. 878, 96 S. Ct. 152, 46 L. Ed. 2d 111 (1975).  Accordingly, we find that the district court did not abuse its discretion in admitting Schmittzehe's handwritten notes.

conspiracy and voluntarily decided to join.[12]  Accordingly, we hold that there was sufficient evidence from which a reasonable jury could conclude that Schmittzehe was guilty beyond a reasonable doubt of mail fraud and conspiracy to commit mail fraud.

III

Rushton and Schmittzehe both contend that the district court erred in not granting their motion for severance, pursuant to FED. R. CRIM. P. 14.  When defendants have been properly joined under FED. R. CRIM. P. 8(b), "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, ___, 113 S. Ct. 933, 938, 122 L. Ed. 2d 317 (1993).  Accordingly, where joinder is proper in the first instance, we will review only for abuse of discretion.  *United States v. McCord*, 33 F.3d 1434, 1452 (5th Cir. 1994), *cert. denied*, __ U.S. __, 115 S. Ct. 2558, 132 L. Ed. 2d 812 (1995).

Rule 8(b) provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged

---

[12]     Schmittzehe argues that he at all times merely relied on the advice of Sovereign Insurance's legal counsel and other experts involved in structuring these deals.  The evidence presented at trial on this issue was conflicting, however, and the jury was entitled to reject Schmittzehe's defense.  Likewise, the jury was entitled to credit the testimony of Nielsen as to what Schmittzehe represented at the closing of the Marble Falls Deal, even though the Defendants presented substantial impeachment evidence with respect to this witness.

to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." FED. R. CRIM. P. 8(b). Furthermore, "Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count." *Id.* The interests of efficiency and justice have led to a preference in the federal system for joint trials of defendants who are indicted together. *Zafiro*, 506 U.S. at ___, 113 S. Ct. at 937.

Schmittzehe argues that because he joined Sovereign Insurance well after the $10,000 bribe and the stock buy out of the dissatisfied investors had taken place, neither of these events had any probative bearing on any crimes alleged against him personally. Schmittzehe also contends that the indictment alleged, and the proof submitted at trial established, multiple conspiracies: (1) to obtain a certificate of authority to sell insurance; (2) to gain control of the company through the buy out; and (3) to provide for the continued operation of the insurance company through fraudulent reporting. Rule 8(b) does not require, however, that each defendant have participated in the same act or acts. *United States v. Dennis*, 645 F.2d 517, 520 (5th Cir. Unit B), *cert. denied*, 454 U.S. 1034, 102 S. Ct. 573, 70 L. Ed. 2d 478 (1981); *see also United States v. Lindell*, 881 F.2d 1313, 1318 (5th Cir. 1989) ("The fact that an indictment does not charge each appellant with active participation in each phase of the conspiracy does not constitute

-18-

misjoinder."), *cert. denied*, 496 U.S. 926, 110 S. Ct. 2621, 110 L. Ed. 2d 1056 (1990).  All that is required is "a series of acts unified by some substantial identity of facts or participants." *Dennis,* 645 F.2d at 520 (internal quotation marks omitted).  The indictment did not allege multiple conspiracies, but rather a single scheme with multiple purposes.[13]  Moreover, the evidence of how Sovereign Insurance was established and Krenning and Rushton gained control through the buy out was relevant to establishing the overall scheme to defraud.  Accordingly, we find that joinder was proper under Rule 8(b).

Relief from prejudicial joinder may be had under Rule 14[14] if the defendant can demonstrate "specific and compelling prejudice." *McCord*, 33 F.3d at 1452.  In order to demonstrate that the district court abused its discretion by failing to grant a motion for

---

[13]    The indictment charged:

   The primary objects and purposes of the conspiracy, among others, were:
   1. To obtain a certificate of authority to sell insurance within the State of Louisiana.
   2. To provide for the continued operation of Sovereign Fire even though Sovereign Fire was unable to timely pay valid claims submitted to the company.

[14]    Rule 14 states in pertinent part:

   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

FED. R. CRIM. P. 14.  As the Supreme Court has noted, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at __, 113 S. Ct. at 938.

-19-

severance, the defendant must show that: "(1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration." *Id.* Both Schmittzehe and Rushton have failed to make the necessary showing.

Rushton essentially argues that the disparity between his own culpability and that of his co-defendants, along with the complexity of the case, prejudiced him to such an extent that his trial was rendered unfair. However, "A quantitative disparity in the evidence does not by itself warrant severance nor does the mere presence of a spillover effect." *United States v. Mitchell*, 31 F.3d 271, 277 (5th Cir.), *cert. denied*, __ U.S. __, 115 S. Ct. 455, 130 L. Ed. 2d 363 (1994). We also find that the district court cured whatever risk there was of prejudice with proper jury instructions.[15] *See Zafiro*, 506 U.S. at __, 113 S. Ct. at 939

_____

[15] Among other things, the district court carefully instructed the jury that it must give separate consideration to the evidence as to each defendant, that each charge and the evidence pertaining to it should be considered separately, and the fact that the jury may find a particular defendant guilty or not guilty as to one of the offenses charged should not control the jury's verdict as to any other offense charged. The district court also instructed the jury that the mere fact that Defendants Schmittzehe, Rushton, and Krenning operated and managed Sovereign Insurance together, and associated with others employed there, and discussed common aims and interests with others, did not necessarily establish proof of a conspiracy.

Moreover, we note, without expressing any approval, that at the specific request of Schmittzehe, the district court also instructed the jury that it could not consider against Schmittzehe, Bishop, or Cavin any of the evidence of the $10,000 payment to the Commissioner of Insurance, or the alleged stock purchase from the other shareholders. *Cf. United States v. Netterville*, 553 F.2d 903, 912 (5th Cir. 1977) (holding that once a defendant becomes associated with a conspiracy he is responsible for all of the acts of the conspiracy, even those which occurred before or after his association with the conspiracy), *cert.*

(concluding that similar instructions were sufficient to cure any possibility of prejudice); *Mitchell*, 31 F.3d at 276 (same). Finally, the acquittal of Bishop and Calvin supports the inference that the jury was able to sort and consider separately the evidence against each of the defendants. *See McCord*, 33 F.3d at 1452 (concluding that the acquittal of each of the defendants on at least one count reflected that the jury was able to consider the evidence separately as to each defendant and each count). Rushton and Schmittzehe have failed to demonstrate specific and compelling prejudice. Accordingly, we hold that the district court did not abuse its discretion in denying their Rule 14 motion for severance.

IV

Schmittzehe argues that district court erred by denying his motion for a new trial based on newly discovered evidence. Such motions are generally disfavored by the courts, and we view them with great caution. *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991). We will reverse the district court's denial of a motion for a new trial only when there is a "clear abuse of discretion." *Id.* Newly discovered evidence may warrant a new trial if: (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) the evidence would probably lead

---

*denied*, 434 U.S. 1009, 98 S. Ct. 719, 54 L. Ed. 2d 752 (1978).

-21-

to an acquittal. *United States v. Williams*, 985 F.2d 749, 757 (5th Cir.), *cert. denied*, 510 U.S. 950, 114 S. Ct. 148, 126 L. Ed. 2d 110 (1993).

Schmittzehe contends that the settlement documents in a separate lawsuit filed by the Commissioner of Insurance against John Nielsen, seeking to enforce Sovereign Insurance's mortgage and foreclose on the Marble Falls property, reveal that the Government took a position contrary to the one they asserted at trial. Schmittzehe claims that these documents disclose for the first time that the Internal Revenue Service took the position that Sovereign Insurance had a valid first lien and mortgage on the Marble Falls property. Contrary to what Schmittzehe argues, however, the Government argued at his trial that the Marble Falls deal was fraudulent, not because the insurance company had failed to obtain a first lien on the property, but because the parties agreed that the property was not at risk, and because the value of the property was overstated. Moreover, the Defendants presented evidence that Sovereign Insurance had obtained a valid first lien on the property. They also brought out on cross-examination that the IRS had filed an answer in the aforementioned lawsuit acknowledging that its tax lien was inferior to the Commissioner of Insurance's lien on the property. Although Schmittzehe could not have discovered the settlement documents prior to trial, we find that this evidence of the Government's position with respect to

Sovereign Insurance's lien on the Marble Falls property is merely cumulative and would not likely result in an acquittal for Schmittzehe if he were given a new trial. Accordingly, we hold that the district court did not abuse its discretion in denying Schmittzehe's motion for a new trial based on newly discovered evidence.[16]

V

The Government cross-appeals from the district court's loss calculation for purposes of sentencing under U.S.S.G. § 2F1.1.[17] The Presentence Report ("PSR") recommended that the base offense level for each Defendant be increased by 15 levels based on a calculated loss of $14,867,934.26.[18] The district court rejected the PSR's recommendation and instead appeared to calculate the loss attributable to each defendant based on the false or inflated value of the "rented" or nonexistent asset reported on Sovereign

---

[16] Finally, Schmittzehe and Rushton contend that the district court lacked subject matter jurisdiction in this case because of § 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). This argument is foreclosed by *United States v. Cavin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (holding that the preemption provision of the Act does not apply to a fraud prosecution because there is no conflict with state insurance regulation).

[17] In cases involving fraud or deceit, the Sentencing Guidelines provide for a graduated increase in the base offense level according to the amount of the loss. *See* U.S.S.G. § 2F1.1.

[18] Defense counsel stipulated at trial that this loss amount included the entire projected loss to the Louisiana Insurance Guarantors Association, including outstanding claims, unpaid premiums and estimated settlements on future claims.

Insurance's annual and quarterly statements.[19] We give considerable deference to a district court's factual findings at sentencing, and we will reverse only if they are clearly erroneous. *United States v. Robichaux*, 995 F.2d 565, 571 (5th Cir.), *cert. denied*, 510 U.S. 922, 114 S. Ct. 322, 126 L. Ed. 2d 268 (1993). A factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole. *Id.* The commentary to § 2F1.1 states that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n.8).

In deciding whether the district court arrived at a reasonable estimate of the loss attributable to the Defendants' fraud scheme, we must first determine whether the court used an acceptable method of calculating the amount of loss. *See United States v. Henderson*, 19 F.3d 917, 927-29 (5th Cir.) (remanding for resentencing because

---

[19]    In its "Statement of Reasons for Imposing Sentence," the district court merely stated that as to loss amount, "the Court determines that Mr. Krenning should be held liable for losses stemming from the Marble Falls transaction, the Bay-Sunbelt transaction, the Falcon Pipeline transaction, the Dutschke building, and the Torrey Group mortgages, for a total of $2.8 million losses to the company." Based on this loss amount, the district court added 13 levels to Krenning's base offense level.
    The district court determined that "Mr. Rushton should be held liable for losses stemming from the Marble Falls transaction, the Bay-Sunbelt transaction, the Falcon Pipeline transaction, the Dutschke building, and the Torrey Group Mortgages, for a total of $2.8 million in losses to the company." Based on this loss amount, the district court added 13 levels to Rushton's base offense level.
    Finally, the district court determined that "Mr. Schmittzehe should be held liable only for losses stemming from the Marble Falls transaction and the Bay-Sunbelt transaction, for a total of $850,000 losses to the company." Based on this loss amount, the district court added 11 levels to Schmittzehe's base offense level. We note that the district court did not explain why, based on its method of calculating loss, it decided not to attribute the Torrey Group transaction "losses" to Schmittzehe as well.

the district court used a legally flawed method of calculating the loss), *cert. denied*, __ U.S. __, 115 S. Ct. 207, 130 L. Ed. 2d 137 (1994). The Sentencing Guidelines clearly contemplate that the method used to calculate the amount of loss will vary according to the type of fraud at issue in the case. *See* U.S.S.G. § 2F1.1, comment. (n.7) (providing examples of fraud where additional factors are to be considered in determining the loss or intended loss).[20] The method used to calculate the amount of loss, however, must bear some reasonable relation to the actual or intended harm of the offense.[21] Whatever method is employed, the focus of the loss calculation should be on the harm caused to the victim of the fraud. *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996).

Having carefully reviewed the record, we conclude that the

---

[20] The commentary to the Sentencing Guidelines also provides that the reasonable estimate of loss:

> for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

U.S.S.G. § 2F1.1, comment. (n.8)

[21] *See* U.S.S.G. § 2F1.1, comment. (n.7) (stating that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss"); *see also Henderson*, 19 F.3d at 928 (concluding that the Sentencing Guidelines refer to *actual intent*, not constructive intent); *United States v. Tedder*, 81 F.3d 549, 551 (5th Cir. 1996) ("Where the defendant intends to repay the loans, then actual loss, rather than intended loss, is the appropriate basis for calculating loss under § 2F1.1."). Although the Sentencing Guidelines recognize the *offender's gain* from committing the fraud as a possible alternative method of calculating the loss amount, *see United States v. Smithson*, 49 F.3d 138, 143 (5th Cir. 1995), the commentary to the Guidelines also states, "The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1, comment. (n.8).

-25-

district court's method of calculating the amount of loss in this case bears no reasonable relation to the actual or intended harm of the offense.  In its "Statement of Reasons for Imposing Sentence," the district court stated that it was holding the Defendants liable for "losses to the company."[22]  The district court does not explain how the "losses to the company" are related to the harm inflicted on the insureds.  Moreover, we are unable to determine how the falsely inflated values of the "rented" assets))which the district court appears to equate with "losses to the company"))relate to the loss caused by the Defendants' fraud scheme.  Defendants argue that the district court's calculation method was consistent with Application Note 7(a) to § 2F1.1 for "Fraud Involving Misrepresentation of the Value of an Item or Product Substitution." U.S.S.G. § 2F1.1, comment. (n.7).  Where a fraud involves the misrepresentation of the value of an item, the Sentencing Guidelines suggest that the loss is the amount by which the item was overvalued.  *Id.*  This method of loss calculation, however, is appropriate only where the overstated value is the actual object of the fraud, for example through a sale or exchange of the overvalued item.[23]

---

[22]     *See supra* note 19.

[23]     *See* U.S.S.G. § 2F1.1, comment. (n.7):

Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.*, $30,000).  In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid

In the present case, the overvalued or nonexistent mortgage properties were merely the mechanism through which the Defendants disguised the insolvent condition of their insurance company and thereby continued to sell insurance policies to the public. The harm to the public, and ultimately the State of Louisiana, was the losses to individual insureds caused by the sale of insurance policies backed by an insolvent insurance company. The district court's method of calculating the amount of loss is therefore flawed, in this case, to the extent that it focuses on the "losses to the company" or the overstated value of the assets reported on Sovereign Insurance's annual and quarterly statements.[24] Accordingly, we reverse the district court's findings as to loss amount and remand for resentencing.

VI

The Government also cross-appeals from the district court's refusal to apply, as to each defendant, a four-point enhancement for jeopardizing the safety and soundness of a financial institution, under U.S.S.G. § 2F1.1(b)(6). We review *de novo* the

---

by the victim for the product and the amount for which the victim could resell the product received.

[24] *Cf. United States v. Hill,* 42 F.3d 914, 918-19 (5th Cir.) (affirming district court's determination that loss amount was the fraudulent face value of securities, rather than amount paid by victims to "rent" the worthless securities), *cert.* denied, __ U.S. __, 116 S. Ct. 130, 133 L. Ed. 2d 79 (1995); *United States v. Chappell*, 6 F.3d 1095, 1101 (5th Cir. 1993) (affirming the district court's determination that loss amount was stated value of the fraudulent checks plus their average value times the fifty-one blank checks also attributable to defendants), *cert. denied*, __ U.S. __, 114 S. Ct. 1235, 127 L. Ed. 2d 579 (1994).

district court's application of the Sentencing Guidelines, and we will affirm the district court's factual findings unless they are clearly erroneous.  *United States v. Clements*, 73 F.3d 1330, 1338 (5th Cir. 1996).

Section 2F1.1(b)(6) provides:  "If the offense substantially jeopardizes the safety and soundness of a financial institution . . . increase by 4 levels.  If the resulting offense level is less than level 24, increase to level 24."  U.S.S.G. § 2F1.1(b)(6)(A). The commentary to § 2F1.1(b)(6) provides:

> An offense shall be deemed to have "substantially jeopardized the safety and soundness of a financial institution" if, as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above.

U.S.S.G. § 2F1.1(b)(6), comment. (n.15).  The district court, explicitly following the reasoning of Judge Mitchell in *United States v. McDermott*, declined to apply the four-point enhancement in the context of an institution that was already insolvent when the criminal conduct occurred.  In an unpublished opinion, we rejected the reasoning of Judge Mitchell on this issue. *See United States v. McDermott*, No. 93-3603 (5th Cir. June 5, 1995) (vacating sentence and remanding for resentencing under § 2F1.1(b)(6)).

Application note 15 to § 2F1.1(b)(6) lists four types of damage flowing from the offense which may be deemed to constitute

"jeopardizing the safety and soundness of a financial institution," only one of which is *insolvency*.[25]  From the record, it does not appear that the district court considered the other three bases for enhancement under § 2F1.1(b)(6).  The district court's failure to consider all of the bases for apply § 2F1.1(b)(6) requires us to vacate the Defendants' sentences.  For example, based on the record, we find that there is substantial evidence to support a finding that Defendants' offense "substantially reduced benefits to . . . insureds."  Because we conclude that the district court applied the wrong legal standard, we need not at this point consider the Government's argument that the district court  was clearly erroneous in its implicit finding that the Defendants did not cause the insolvency of Sovereign Insurance.  Upon remand, the district court will have another opportunity to determine whether Defendants' fraud scheme caused the insurance company to become insolvent.  Accordingly, we vacate the Defendants' sentences and remand to the district court for specific findings on the application of § 2F1.1(b)(6) under the correct legal standard.

VII

For the foregoing reasons, we AFFIRM the Defendants' convictions, VACATE their sentences, and REMAND for resentencing

---

[25]     *Cf. United States v. Bullard*, 13 F.3d 154, 158 n.10 (5th Cir. 1994) (noting that application note 10 to § 2B1.1(b)(7)(A), which is worded identically to note 15 to § 2F1.1(b)(6)(A), "does not limit the meaning of the terms 'substantially jeopardizes the safety and soundness of a financial institution' to the situation where the institution becomes insolvent as a consequence of the defendant's conduct").

consistent with this opinion.