**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John H. MICHAEL, Defendant–**
**Appellant.**

No. 00–3136.

United States Court of Appeals,
Sixth Circuit.

July 20, 2001.

Before KENNEDY, SILER and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Defendant John H. Michael appeals from his judgment of conviction and sentence after pleading guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Defendant challenges his sentence claiming that the district court erred in (1) determining the amount of loss under USSG § 2F1.1(b); (2) determining the amount of restitution; and (3) failing to grant a downward departure. For following reasons, we AFFIRM Defendant's sentence.

## BACKGROUND

On June 30, 1999, Defendant waived his right to indictment by a grand jury and was charged by Information with one count of mail fraud in violation of 18 U.S.C. § 1341. On the same day, Defendant entered a plea of guilty to the Information, reserving the right to appeal his sentence. Thereafter, a Pre–Sentence Investigation Report ("PSI") was prepared, which detailed the facts underlying the mail fraud charge.

According to the PSI, Defendant was employed as a captive insurance agent[1] with the Prudential Insurance Company ("Prudential") from 1992 to 1996. Although Defendant was employed by Prudential, he worked out of office space which he personally owned. Prudential offered an incentive program for agents that operated out of space not owned by Prudential. This incentive program, the Marketing Support Program ("MSP"), allowed agents to earn credits that could be used to reimburse the agents for certain business-related expenses. The amount of

---

1. A captive insurance agent is a licensed insurance agent who sells insurance for only one company.

credits an agent earned was determined by the amount of sales the agent made within the preceding calendar year. Under MSP rules, an agent could seek reimbursement for eligible expenses incurred within the fiscal year, April 1 through March 31, following the calendar year in which the credits were earned.

Pursuant to MSP rules and guidelines, eligible expenses included rent, utility bills, telephone bills, structural improvements, staff salaries, staff benefits, office furniture, office equipment, postage, and office supplies. An agent could seek reimbursement by submitting a MSP reimbursement form to Prudential. The agent was required to list the expenses with a description thereof and provide supporting documentation showing that the expenses had actually been incurred. Prudential would then review the claims form to determine whether the expenses were eligible expenses. If the expenses were determined to be eligible, Prudential would issue a reimbursement check up to the amount of unused credits the agent had earned for that year. If eligible expenses surpassed the amount of credits an agent had available, Prudential would not reimburse the agent the surplus amount.

In 1992 and 1993, Defendant earned credits in the MSP program due to his high sales volume. In 1992, Defendant earned $53,241.15 in credits, which could be used in the following fiscal year beginning April 1, 1993 and ending March 31, 1994. In 1993, Defendant earned $91,837 in credits, which could be used in the fiscal year beginning April 1, 1994 and ending March 31, 1995. Defendant applied for and received reimbursements in each fiscal year.

During an audit of Defendant's credit account, Prudential discovered that several of the expenses for which Defendant applied for reimbursement were fabricated. Prudential thereafter filed a complaint for grand theft with the Warren County, Ohio Sheriff's Department. The case was eventually referred to the United States Attorney's Office. The Internal Revenue Service ("IRS") investigated Defendant for violations of Titles 26 and 18 of the United States Code.

In its investigation, the IRS discovered that between April 23, 1993 and November 29, 1994, Defendant had submitted seven reimbursement forms which contained fourteen fraudulent claims for expenses. Prudential reimbursed Defendant for thirteen of the fourteen fraudulent claims, which totaled $45,401.72. The fourteenth fraudulent claim, which was for $22,486.17, was discovered during the audit. For the purpose of submitting these fraudulent claims, Defendant created false customer receipts for items, altered checks and submitted false invoices. Defendant used the postal service to mail these fraudulent reimbursement claims to the Prudential office in Florida.

The PSI calculated Defendant's offense level as eleven, a base offense level of six plus five levels for the amount of loss, and his criminal history category as II. Based on Defendant's calculated offense level and criminal history category, his sentence range under the guidelines was ten to sixteen months. Defendant raised several objections to the PSI, including an objection as to the calculation of loss and the amount of restitution. In addition, Defendant filed a motion for downward departure arguing that (1) the loss amount overstates the seriousness of Defendant's crime; (2) Defendant was actually entitled to the money he fraudulently received from Prudential; (3) Defendant's community and civic duties take his case out of the heartland of fraud cases; and (4) Defendant's criminal history category overstated his criminal history because it was based on two driving under the influence

convictions that occurred within nine days of each other eleven years prior to sentencing.

The district court granted Defendant's downward departure with respect to his criminal history category, giving him a criminal history category of I; his sentence range thus became eight to fourteen months. The district court further departed downward and sentenced Defendant to four months of imprisonment to be served in a half-way house, two years of supervised release, restitution in the amount of $45,401.72, a fine of $15,896, and a $50 assessment fee.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I. Loss Calculation

*Standard of Review*

We review *de novo* the district court's application and interpretation of the sentencing guidelines; however, the district court's factual determinations will not be disturbed unless they are clearly erroneous. *United States v. O'Dell,* 247 F.3d 655, 674 (6th Cir.2001); *United States v. Murphy,* 241 F.3d 447, 458 (6th Cir.2001).

*Analysis*

The district court calculated Defendant's offense level pursuant to USSG § 2F1.1, which governs crimes involving fraud and deceit. Section 2F1.1(a) provides for a base offense level of six; the offense level is thereafter increased according to the amount of loss as indicated in USSG § 2F1.1(b). In the instant case, the district court determined that Prudential's loss amounted to $45,401.72, the total amount of the fraudulent claims submitted by Defendant and paid by Prudential. Because the loss was more than $40,000 but not more than $70,000, Defendant's offense level was increased by five levels. We find no error in the district court's calculation of the loss and reject Defendant's arguments to the contrary.

■ Defendant argues that the district court erred in calculating the amount of loss under USSG § 2F1.1(b) and Application Note 8. Defendant does not dispute that he submitted claims and was reimbursed for $45,401.72 in fraudulent expenses. Defendant instead argues that he simply engaged in a form of product substitution inasmuch as he had receipts for $51,629 in eligible business expenses that consisted of "small ticket" items but chose to submit the fraudulent claims for the "big ticket" items to save paperwork. Defendant also argues that the MSP credits operated as security for any fraudulent claims he submitted and thus his case is similar to that of a fraudulent loan application. Under either theory, contends Defendant, he is entitled to setoff the loss to Prudential by the amount of money he claims Prudential owes him in unclaimed, reimbursable expenses; Prudential's loss under Defendant's theories would therefore be zero.

The government argues that the facts do not support Defendant's claim that he was simply substituting "big ticket" items for a plethora of "small ticket" items to avoid paperwork. The government argues that Defendant instead submitted the fraudulent claims to cover expenses for which he knew he could not receive reimbursement. To support this theory, the government points out that in April of 1993, Defendant submitted a claim for four fraudulent expenses totaling $2619. In that month, Defendant submitted ten of the thirteen claims for expenses he actually incurred. The total of the three expenses for which Defendant did not submit a reimbursement claim was approximately $1000. The government therefore argues that the fraudulent claim could therefore not be a

substitution for the three smaller items totaling $1000. The government argues that similar patterns are present in other months as well.

The government also points out that at most every instance that Defendant had submitted a fraudulent claim, he had recently incurred a substantial expense of that amount or close to it. For instance, when Defendant submitted a fraudulent claim $11,833.80 in furniture in April of 1994, he owed Prudential $11,833.80 for an unrelated insurance contract and had recently spent substantial sums on jewelry and his car. Similarly, in September of 1994, when Defendant submitted a claim which included approximately $8000 in fraudulent expenses, he made a $7500 down payment on a new Lotus automobile. And in August of 1994, when Defendant submitted his fraudulent claim for $22,486 for furniture, he had recently paid $9,996 on his personal VISA Gold Card account.

We do not address the merits of the government's argument inasmuch as it involves a factual determination which was not addressed by the district court and is unnecessary to this Court's decision. As stated above, we find Defendant's arguments unpersuasive and uphold the district court's determination of loss on that basis.

" '[T]he relevant point in time for determining the amount of loss in a fraud case is at the time the crime was detected, rather than at sentencing.' " *United States v. Scott,* 74 F.3d 107, 111–12 (6th Cir.1996) (citations omitted). The focus of the loss calculation should be harm caused to the victim of the fraud. *United States v. Krenning,* 93 F.3d 1257, 1269 (5th Cir. 1996). Application Note 8 provides that the amount of loss is determined by "the value of the money, property or services unlawfully taken." USSG § 2F1.1, Application Note 8.

There are exceptions, however, to this method of calculating loss. The two exceptions which are pertinent here are the product substitution exception and the fraudulent loan application exception. With respect to these exceptions, the guidelines provide:

(a) *Fraud Involving Misrepresentation of the Value of an Item or Product Substitution*

A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.,* $30,000). In a case involving misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

(b) *Fraudulent Loan Application and Contract Procurement Cases*

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

USSG § 2F1.1, Application Note 8(a), (b). We conclude that Defendant's case fits within neither the product substitution ex-

ception nor the exception for fraudulent loan applications.

Defendant's product substitution argument is fairly simple. He argues that his case is similar to product substitution because he just submitted fraudulent claims in the place of legitimate claims to reduce paperwork. We find Defendant's argument as unavailing as it is simple.

Application Note 8 provides that product substitution involves the "misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless)." USSG § 2F1.1, Application Note 8(a). In determining the loss in a case of product substitution, the loss is the difference between the amount paid and the amount for which the item could be resold. *Id.* In determining the loss in the case of a pure misrepresentation of value, the loss is the amount by which the item is overvalued. *Id.* The court must therefore look to the object of the fraud. *Krenning,* 93 F.3d at 1269–70. Defendant's case fails to fit within either of these categories, because the reimbursement claims he submitted were worthless; had Prudential known the truth, the claims would not have been eligible for reimbursement at all. This is not a case where Defendant submitted receipts for businesses expenses he actually incurred but doctored the receipts such that the amount of the business expense was more than he actually paid. Instead, Defendant submitted fraudulent receipts for expenses he had not incurred at all. Defendant's case is therefore more like a naked taking rather than selling a lesser quality item or overstating the value of an item. *See, e.g., United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir.1991) (distinguishing between naked fraudulent takings and overstatement of value or product substitution). Because the claims submitted to Prudential were worthless, there is no "resell" value. In essence, the amount by which the claims were overvalued was the amount of the claims them-

selves. Here, unlike in a true product substitution or misrepresentation case, the object of Defendant's fraud was not to overstate the value of valid expenses but to receive reimbursements for invalid, worthless claims. *See, e.g., Krenning,* 93 F.3d at 1269–70 (recognizing that this method of calculation is only appropriate in instances where the actual object of the fraud is the overstated value).

■ We similarly reject Defendant's argument that his MSP credits operated as security for the fraudulent reimbursement claims, likening his crime to that of a fraudulent loan application. Defendant's argument fails to account for the rules governing the MSP program. The MSP credits are unlike security in a fraudulent loan application case. They serve a limited purpose and have no cash value independent of the MSP program. The MSP credits also have no value outside of a limited scope of time. Under the program, Defendant was required to submit the application for reimbursement within the same fiscal year as the expense was incurred; and any unused credits could not be carried over to the next fiscal year. Furthermore, Defendant was not entitled to and Prudential was not contractually obligated to pay for reimbursement claims for which no reimbursement application was submitted; the MSP program information describes the program as a "remittance–based system under which [an agent] request[s] reimbursement for expenses". (J.A. at 218.) Based on the nature of the MSP program, we conclude that the MSP credits earned by Defendant could not operate as a security for the fraudulent reimbursement claims he submitted inasmuch as they could not be readily converted to cash and had no independent cash value.

To the extent that Defendant argues that he should be allowed to setoff Pruden-

tial's loss despite the fact that his case does not fit squarely within the exceptions outlined in USSG § 2F1.1, Application Note 8, *United States v. Allison,* 86 F.3d 940, 943 (9th Cir.1996); *see also, e.g., Krenning,* 93 F.3d at 1269, this argument must be rejected under the facts of this case.

Contrary to Defendant's argument, Prudential actually suffered a loss. Because the claims were fraudulent, Prudential was not contractually obligated to pay the $45,401.72 in claims. But upon submission of the fraudulent claims, Prudential did just that—paid Defendant $45,401.72 to which he was not entitled. Except to the extent that Defendant had submitted other legitimate claims, which was not the case here, Prudential would not have paid out the $45,401.72. We therefore conclude that Prudential in fact suffered a loss equal to the amount of the fraudulent claims.[2]

## II. Restitution

### Standard of Review

■ We review *de novo* whether restitution is legally permissible, while the amount of restitution ordered, if any, is reviewed for abuse of discretion. *United States v. Adams,* 214 F.3d 724, 730 (6th Cir.2000). Inasmuch as mail fraud is an offense punishable under Title 18 of the United States Code, it is clear that restitution is legally permissible in this case. *See* 18 U.S.C. §§ 3663–3664. The essence of Defendant's argument is that the district court improperly calculated the amount of

loss. Accordingly, the district court's determination of the loss will not be reversed unless the district court abused its discretion.

### Analysis

Under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, a court may order a criminal defendant to pay restitution to a victim of crimes committed under Title 18 and certain drug related statutes for the victim's loss. A court must consider, *inter alia,* "the amount of loss sustained by any victim as a result of the offense." 18 U.S.C. § 3664(a). In determining the amount of loss sustained, the court "shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation ...." 18 U.S.C. § 3663(e)(1).

■ In the instant case, Defendant argues that the district court erred in ordering him to pay restitution to Prudential in the amount of $45,401.72, the amount of the fraudulent claims. Defendant argues that the loss to Prudential should have been setoff by $51,629, the amount Defendant claims that Prudential owed him for eligible claims he did not submit for reimbursement. Defendant's argument, however, fairs no better in the context of calculating restitution than it did in the context of calculating the amount of loss.

Prudential was only required, under the MSP program, to reimburse Defendant for eligible expenses for which he submitted a reimbursement application and proof of

---

**2.** Even if this Court were to consider, however, the value of eligible expenses Defendant could have submitted at the time the fraud was discovered, the Court could not consider those expenses which were not made in the fiscal year in which the fraud was discovered. Under the MSP program, requests must have been submitted within the fiscal year that they were made. Accordingly, Defendant could not under any circumstances claim that the loss should be setoff by expenses he incurred but did not seek reimbursement for in fiscal year April 1, 1993 through March 31, 1994. Likewise, he could not setoff any reimbursable expenses incurred after the fraud was discovered. Defendant could only receive credit for expenses incurred between April 1, 1994 and the date his fraudulent behavior was discovered.

the expense. The record is void of any evidence which shows that Defendant submitted legitimate reimbursement claims to Prudential for eligible business expenses for which he was not reimbursed. It was not enough for Defendant to simply incur the expense. The contractual obligation to reimburse Defendant did not arise under the MSP program unless and until Defendant submitted a form application for reimbursement of eligible expenses accompanied by the necessary documentation. The expenses Defendant now claims Prudential owes him were never, at least as far as the record indicates, submitted to Prudential for reimbursement. Absent submission of the proper documentation, it appears that Prudential was not and is not under a contractual obligation to pay Defendant for those expenses. Therefore, they cannot serve as the basis for a setoff of Prudential's loss.

### III. Downward Departure

■ A district court's refusal to grant a discretionary downward departure is not appealable unless the district court erroneously believed it lacked authority to grant such a departure as a matter of law. *United States v. Cook*, 238 F.3d 786, 790–91 (6th Cir.2001). Because the record indicates that the district court was aware of its authority to grant a downward departure, we decline to review Defendant's claim.

This Court has stated that "[a] district court judge has no duty 'to state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so.'" *United States v. Owusu*, 199 F.3d 329, 349 (6th Cir.2000) (quoting *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir.1995)). Consequently, "an appellate court should be reluctant to treat as ambiguous a ruling which does not affirmatively state that the judge knew he could depart downward but failed to do so." *Id.* (citations and quotations omitted).

The *Owusu* Court concluded that "[w]e should therefore assume that a district court is exercising its proper discretion when it concludes that a downward departure is unwarranted." *Id.; accord United States v. Prince*, 214 F.3d 740, 766 (6th Cir.2000).

In this case, Defendant submitted a sentencing memorandum and motion to the district court requesting downward departures on four grounds. The district court granted a downward departure based on one of the four grounds, i.e., Defendant's criminal history category, which was originally II, did not fairly represent his actual criminal history. With respect to this ground, which defense counsel specifically raised at the hearing, the district court granted the motion for a downward departure and lowered Defendant's criminal history category to I. Defendant also argued that his offense level should be lowered because the amount of loss calculated under the sentencing guidelines overstated the seriousness of his offense. Defendant further argued that he was actually entitled to the money he fraudulently took from Prudential and was entitled to a downward departure on that basis. These arguments are based on the same theory discussed in sections I and II of the opinion. The record makes clear that the district court properly rejected this theory.

As to the remaining ground, Defendant argued that he should receive a downward departure because his outstanding community service placed his case outside the heartland of mail fraud cases. While Defendant argued this ground in his motion, the record from the sentencing hearing reveals that the following is all that was said about it:

[DEFENSE COUNSEL]: And I might state that there were other matters which we filed on December 21st, and in fact in the future, is at the time of

sentencing, the—this offense becomes a matter of record. As the Court knows from the presentence investigation, my client is a public servant, and—not related to his case, of course—but will be resigning that, which is punishment.

THE COURT: Over which the Court has no control.

[DEFENSE COUNSEL]: We agree, Your Honor. And I certainly state that this Court has no control. But it is an additional consequence that Mr. Michael suffers as a result of the conviction, Your Honor.

THE COURT: Well, I have read all the material that's been furnished to me, and the letters from the community, his family and so forth, about what a fine citizen he has been in all other respects, except for this aberration, and I sympathize with all of them and with the defendant.

All right. Anything else you want to say?

[DEFENSE COUNSEL]: I just submit what we submitted to the Court, and I know the Court has read all of that.

THE COURT: And I presume your comments constitute any comments you would make with regard to mitigation punishment?

[DEFENSE COUNSEL]: Yes, Your Honor.

\*    \*    \*    \*    \*    \*

THE COURT: Do you know of any reason why sentence not be imposed on you at this time, Mr. Michael?

[DEFENSE COUNSEL]: No, Your Honor.

(J.A. at 128–29.) The district court thereafter sentenced Defendant to four months of imprisonment, which was below the guideline range of eight to twelve months.

■■■ Based on the record before the Court, we conclude that the district court was aware of its authority to depart downward based on any of the reasons offered by Defendant. The district court acknowledged the filing of Defendant's sentencing memorandum and his request for a downward departure. As indicated above, the district court acknowledged that Defendant was presenting the evidence of his community service as a basis for mitigation of punishment. We must therefore conclude that to the extent that the district court did not depart downward, it exercised its discretion not to do so. *See Prince,* 214 F.3d at 766; *Owusu,* 199 F.3d at 349. Thus, the district court's denial of Defendant's request for a downward departure is unreviewable.[3]

### CONCLUSION

We conclude that the district court properly calculated the loss sustained by Prudential as required under USSG § 2F1.1

---

**3.** In his reply brief, Defendant argued, on the merits, that he was entitled to a downward departure based on his outstanding community service. While not necessary to this decision, we note that this argument is without merit. "[A] defendant's community involvement is at best a *discouraged* factor in determining the appropriate departure from the guidelines." *United States v. Tocco,* 200 F.3d 401, 434 (6th Cir.2000) (emphasis in original). This Court has noted that "it is not unusual for white-collar offenders to be involved in community activities and that the 'guidelines already considered the nature of white-collar crime and criminals when setting

the offense levels that govern this offense.' " *United States v. Crouse,* 145 F.3d 786, 788 (6th Cir.1998) (citation omitted). To justify a downward departure, the community service must be present "substantially in excess of that which is *ordinarily involved in the offense of conviction." United States v. Kohlbach,* 38 F.3d 832, 838 (6th Cir.1994) (emphasis in original) (citation omitted). We do not believe that Defendant's civic and community service projects, which were primarily completed in his capacity as mayor of the small town in which he lived, however laudable, were so unusual as to warrant a downward departure.

and 18 U.S.C. § 3663(e)(1). Furthermore, the district court's denial of Defendant's downward departure is not appealable. Accordingly, we AFFIRM Defendant's sentence.

KENNEDY, Circuit Judge, concurring.

While I do not disagree with the majority's conclusion that defendant was required to submit an application form to be entitled to reimbursement, I would not deny his request for a reduction in the amount of restitution for items to which he clearly established a right to reimbursement merely because he had failed to file a claim for reimbursement in a timely fashion. The Court's objective in fixing restitution is to determine the amount of Prudential's loss. If Prudential would have paid the same amount or a greater amount for expenses defendant could have properly claimed, it is difficult to see where it incurred a loss.

The problem with the record in this case is that the district court was only provided a list of checks or credit card items which might or might not be reimbursable without any documentation to establish that they were. Several items listed appear to be excluded. For example, car insurance would be excluded under the automobile cost exclusion. In addition, several large items for property improvement would surely be excluded by $887.69 limitation on monthly rent.

The defendant also lists clerical and marketing assistance as a reimbursable item, but such assistance had to be provided by a Prudential clerk or a temporary service clerk from an approved agency in order to be reimbursable. Whether cleaning, usually included in rent, is subject to the rent limitation is also in question. The defendant also lists telephone expenses as reimbursable, but does not differentiate between service related to his role as a Prudential contractor and those related to his other extensive activities.

If defendant claimed reimbursement, items purchased with funds reimbursed under the Marketing Support Program would belong to Prudential. For any of those items, surely he would be required to actually make a claim. As unliquidated collateral claims of uncertain validity, I agree with the majority that should not be offset against the loss. *United States v. Hoglund*, 178 F.3d 410 (6th Cir.1999).