**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul G. GORMAN, Defendant-Appellant.**

**No. 85–3361.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 16, 1986.

Decided Dec. 23, 1986.

Rehearing and Rehearing En Banc Denied Feb. 6, 1987.

Paul G. Gorman, (argued), Maumee, Ohio, pro se.

James M. Cole (argued), Ellyn Marcus Lindsay, Washington, D.C., for plaintiff-appellee.

Before MILBURN and BOGGS, Circuit Judges, and HARVEY,* Senior District Judge.

JAMES HARVEY, Senior District Judge.

Following a jury trial in the United States District Court for the Northern District of Ohio, appellant Paul G. Gorman was convicted on one count of conflict of interest, in violation of 18 U.S.C. § 208, and one count of asking for or receiving illegal gratuities, in violation of 18 U.S.C. § 201(g). The district court sentenced Gorman to a term of imprisonment of one year and one day on each count, the sentences to run concurrently. Gorman now appeals. We affirm the trial court.

Gorman was an Economic Crime Specialist and an Assistant United States Attorney assigned to the United States Attorney's Office for the Northern District of Ohio in Toledo. From August of 1982 through February or April of 1983, he was the lead prosecutor investigating a check kiting scheme which involved a bankrupt, James Hartley, and several banks with which Hartley had dealt. Gorman worked closely on the case with Merle Weber, (later indicted with Gorman) a creditors' representative from Phoenix, Arizona who was hired by a number of Hartley's creditors to recover his outstanding debts. Weber was to receive 10% of the funds recovered by those creditors.

The trustee of this bankruptcy was Quentin Derryberry of Wapakoneta, Ohio.

He was assisted by a law clerk named Christine DeSanctis. In November of 1981, Weber contacted Derryberry and began to work with him on the case. As time went on, Weber took control of the case, and DeSanctis began to work for him.

In the course of his work, Weber concluded that Hartley engaged in a massive check kiting and illegal bank stock transfer scheme related to the bankruptcy. In all, it appeared that as much as $12.5 million in assets might be available for creditors in the bankruptcy, potentially resulting in a huge fee for Weber.

Expert testimony at trial indicated that any money a criminal bankrupt earns subsequent to bankruptcy is subject to creditors' claims. If others, including banks, are convicted of participating in criminal activity which harmed the creditors, creditors could seek recovery from such parties. In civil suits, a bank's criminal conviction could be introduced under the doctrine of collateral estoppel, thus making the only remaining issue that of damages. Thus, threats of criminal action against a bank are an effective lever in forcing a settlement in a civil bankruptcy suit, as a bank may choose to settle in order to avoid a measure of culpability, or just in an attempt to avoid the adverse publicity associated with a criminal investigation.

In the summer of 1982, Weber sought to expedite matters by seeking the criminal investigation of various banks and individuals associated with hartley. He, Derryberry, and DeSanctis first met with Gorman in the U.S. Attorney's Office in Toledo on August 10, 1982. Gorman indicated he would pursue the case.

During a later conversation, DeSanctis told Gorman she and Weber were planning on forming a creditors' representative business when she left law school, and that the funds to start it would come from the proceeds of the Hartley case. On August 27, 1982, Gorman met DeSanctis at her apartment and stated that he would like to

* The Honorable James Harvey, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

work with her and Weber. He further stated that, as a condition of employment, he would need $300,000.00 put in an escrow account to guarantee him two years salary. Gorman indicated that either Weber could provide the money, or that two Hartley creditors with potential criminal liability could provide it. He stated that if the creditors provided the money, he would write his report on the Hartley case so as to discourage their prosecution.

Gorman made frequent inquiries to Weber and DeSanctis concerning employment with them, and indicated his position with the U.S. Attorney's Office would be of great benefit in doing creditor representative work across the country. Furthermore, shortly after his initial meeting with Weber, Gorman prepared a document outlining the number of people involved in the Hartley matter and the charges which could be brought against them, and forwarded the document to Weber. Gorman also kept Weber apprised of grand jury proceedings in the Hartley case, and discussed how to time grand jury subpoenas to put extra pressure on banks to settle, as well as numerous other unsavory tactics.

On February 12, 1983, Gorman and Weber met for breakfast in Maumee, Ohio. During this time, Gorman wrote down what his conditions for employment with Weber would be. These conditions were similar to those he previously outlined to DeSanctis. Weber allowed Gorman to believe these conditions would be established. Gorman continued to press the issue, however, and Weber stalled. This eventually led to a falling out between the two on March 30, 1983. The Hartley file was closed in April, 1983.

At all relevant times, Gorman was in dire financial straits having, among other things, gone over $25,000 over budget in the construction of his new home, in which he acted as general contractor. In early November of 1982, Gorman agreed to accept a $25,000 loan from Weber. As the money was not immediately forthcoming, Gorman flew to Phoenix unannounced around Christmas of 1982 to demand the money personally. He eventually contacted Weber, who was in Montana at the time, by phone. Gorman told Weber he needed $2,000 that day to pay contractors' bills, and that if he did not receive the money he would lose his job and the Hartley investigation would stop. On December 27, 1982, Weber arranged for $2,000 cash to be taken from the account of a Mr. Huffman, the Chairman of the Board of the People's Bank of McComb, Ohio, and delivered to Gorman's wife at a motel in Findlay, Ohio. This was a loan from Huffman to Weber for the purpose of making a loan to Gorman.

On December 28, 1982, another loan was made using a similar procedure. This loan was for $3,500.

On January 3, 1983, Gorman demanded another $10,000 from Weber, again under threat that his job would be lost and the Hartley investigation stopped if he did not receive the money. Weber again called Huffman and arranged for Gorman to receive immediately a $10,000 unsecured personal loan from the McComb bank.

Testimony at trial showed the extent of Gorman's financial difficulties. His monthly income was $2,515, and his monthly liabilities were $3,428, exclusive of outstanding construction debts. Despite this, Gorman repaid Weber and the bank in full, with interest (although without late fees) on May 6, 1983. In order to do so, he obtained a loan from Huntington Bank in Toledo. The loan was very reluctantly granted on the conditions that Gorman give a third mortgage on his home, tear up his credit cards, develop a financial recovery plan and review it periodically with the bank, attempt to sell his house, and agree to have his wife go back to work.

Gorman was convicted on one count each of violation of 18 U.S.C. § 208 and 18 U.S.C. § 201(g). On appeal, he claims the trial court erred in denying his motion for judgment of acquittal on both counts, and that the government's proofs varied prejudicially from the indictment.

## I. The "Conflict of Interest" Count

Gorman claims the trial court erred in denying his motion for judgment of acquittal as to his indictment under 18 U.S.C. § 208. Section 208(a) states as follows:

Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse ... or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be fined not more than $10,000, or imprisoned not more than two years, or both.

18 U.S.C. § 208(a).

Accordingly, a violation of Section 208 in this case required proof: 1) that Gorman, who was at the time in question a federal government employee, negotiated concerning employment with Weber; 2) that Weber had a financial interest in the judicial proceedings conducted by Weber at the time the negotiations were taking place; and 3) that Gorman knew of this interest.

Gorman first claims the trial court erred in denying his motion because there was insufficient evidence that he was negotiating for employment with Weber. The proper standard for evaluating a motion for judgment of acquittal is whether, considering the facts in the light most favorable to the government, there is evidence from which a jury might find the defendant guilty beyond a reasonable doubt. If such evidence exists, the motion must be denied. *United States v. O'Boyle,* 680 F.2d 34 (6th Cir.1982).

"Negotiation" is to be given its common, everyday meaning for purposes of Section 208(a). *United States v. Conlon,* 628 F.2d 150, 154 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982). The government set forth substantial evidence showing that such negotiation had taken place, including Gorman's initial conversation with DeSanctis and his list of his conditions for taking employment with Weber. This in itself is clearly enough evidence for the jury to conclude beyond a reasonable doubt that Gorman had been "negotiating" with Weber for employment. Therefore, the trial court did not commit error by denying Gorman's motion for this reason.

Gorman next argues that his motion should have been granted because all the alleged negotiations took place after the Hartley investigation ended. Taking the evidence in the light most favorable to the government, it was shown that Gorman and DeSanctis, Weber's assistant, engaged in discussions concerning Gorman's prospective employment with Weber as early as August of 1982. Further, the government's evidence indicated that Gorman wrote his conditions for employment in Weber's presence in February of 1983, and that the Hartley investigation, in which Weber had a financial interest, was closed in April of 1983. It is therefore clear this assignment of error is without merit.

Next, the appellant argues that the district court should have granted his motion because the government provided insufficient evidence to show that Weber had a cognizable financial interest in the outcome of his investigation of the Hartley bankruptcy. A financial interest exists on the part of a party to a Section 208 action where there is a real possibility of gain or loss as a result of developments in or resolution of a matter. Gain or loss need not be probable for the prohibition against official action to apply. All that is required is that there be a real, as opposed to a speculative, possibility of benefit or detriment. Office of Government Ethics Advisory Opinion, 83 OGE 1 (January 7, 1983).

■ The evidence presented by the government in this case showed Weber had a 10% contingent fee arrangement with Hartley's creditors. Expert testimony indicated that criminal investigations against banks accused of cooperating or conspiring with a criminal bankrupt could prompt their settlement with the bankrupt's creditors, at times regardless of the banks' culpability. Gorman was investigating these banks. These facts could cause the jury to find that Weber stood a real possibility of sustaining financial gain or loss as a result of the official actions Gorman was undertaking. Accordingly, this assignment of error is also meritless.

■ The final assignment of error as to this count is that there was no proof that Gorman knew Weber was using the criminal investigation to further civil actions in which he was financially interested. Gorman, however, misstates the intent element of Section 208. Section 208 sets forth an objective standard of conduct which is directed not only at dishonor, but also at conduct which tempts dishonor. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1960).[1] The specific standard applicable in the present case is that the defendant must have known that the person with whom he was negotiating concerning employment had a financial interest in the defendant's official work. *See K & R Engineering Co. v. United States*, 616 F.2d 469, 472 (Ct.Cl.1980).

The evidence at trial consistently indicated that Gorman knew Weber had a financial interest in the Hartley-related cases. For example, Gorman kept Weber and DeSanctis fully apprised of confidential grand jury activity in the Hartley case. Further, Gorman repeatedly threatened Weber with the ruin of the criminal investigation of the banks if he did not immediately receive loans from him. As this final claim of error is also without merit, the district court clearly acted correctly in denying Gorman's motion for judgment of acquittal with respect to this count.

## II. The "Illegal Gratuity" Count

Gorman further argues that the trial court erred in denying his motion for judgment of acquittal as to his indictment under 18 U.S.C. § 201(g). Section 201(g) states as follows:

> Whoever, being a public official, ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him [shall be guilty of an offense.]

18 U.S.C. § 201(g).

The appellant argues that there was insufficient evidence to uphold his conviction under this statute. Specifically, he argues that the loan and promises of future employment were not "things of value" for purposes of Section 201(g), that the government failed to prove the requisite criminal intent, and that the government's proofs varied prejudicially from the indictment.

■ Gorman argues that the loans he received from Weber were not "things of value" because he repaid them in full with interest. As such, he argues, he merely entered into an economic exchange, receiving something for which he paid a fair price. Although this argument is logical, it is meritless under Section 201(g).

■ The purpose of Section 201(g) is to reach all situations in which a government agent's judgment concerning his official duties may be clouded by the receipt of an item of value given to him by reason of his position. *United States v. Evans*, 572 F.2d 455, 480 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

1. *United States v. Mississippi Valley Generating Co.* was directed at 18 U.S.C. § 434, the predecessor to Section 208. The case remains applicable, however, as the purpose of Section 208 is to "strengthen" its predecessor without changing any of its underlying policies. *United States v. Conlon*, 628 F.2d 150, 155 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982).

Contrary to the appellant's argument, there is no authority for the proposition that the items received must be "gratuities" as that term is commonly understood. In order to put the underlying policy of the statute into effect, the term "thing of value" must be broadly construed. Accordingly, the focus of the above term is to be placed on the value which the defendant subjectively attaches to the items received. *United States v. Williams*, 705 F.2d 603, 623 (2d Cir.), *cert. denied*, 464 U.S. 1007, 100 S.Ct. 524, 78 L.Ed.2d 708 (1983).

The loans which Gorman received are things of value for purposes of Section 201(g). There is no dispute that the appellant was having severe financial difficulties during the time period in question. Additionally, the numerous conditions on the loan which Gorman received from the Huntington Bank strongly indicate that he could not have received substantial unsecured loans at all, much less on extremely short notice. The receipt of such loans from Weber therefore would have had an objective, as well as a subjective, value to Gorman over and above their market price. These loans would, therefore, qualify as things of value under the broad subjective definition set forth under Section 201(g).

■ A similar analysis applies to the future employment promised the appellant by Weber. Gorman argues that the future employment with Weber would not have been a thing of value because any compensation received would have been for additional duties performed. However, Gorman neglects to indicate that the employment with Weber would have paid him $150,000 per year for two years. This was approximately three times his salary as an Assistant United States Attorney. Additionally, he was to stay with the United States Attorney's Office full time during this two-year period, using that job, in part, to refer cases to Weber. Considering Gorman's precarious financial situation, such future employment would clearly be a thing of value for purposes of Section 201(g).

■ Next, Gorman argues that the government did not prove that he sought or received either the future employment or the loans "for or because of any official act performed or to be performed by him" as required by Section 201(g). Once again, the issue to be resolved is whether, when considering the facts in the light most favorable to the government, evidence exists from which the jury might find the defendant guilty beyond a reasonable doubt. *United States v. O'Boyle*, 680 F.2d 34 (6th Cir.1982). We conclude that such evidence was presented at trial.

With respect to the loans, evidence was presented which showed that Gorman repeatedly threatened Weber that his investigation of the Hartley bankruptcy would end if he did not receive the loans he requested. With respect to Gorman's future employment with Weber, the government presented evidence which indicated Gorman was to stay on with the United States Attorney's Office while working with Weber at least in part for the purpose of referring Hartley-type cases to Weber. As such, this assignment of error is without merit.

■ Finally, the appellant argues that proofs under this count varied from the indictment to the extent that the indictment was constructively amended. A variance occurs when the proof introduced at trial differs materially from the facts alleged in the indictment. Variances which create a substantial likelihood that a defendant may have been convicted of an offense other than that charged by the grand jury are constructive amendments, and are considered per se prejudicial. *United States v. Beeler*, 587 F.2d 340 (6th Cir.1978), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In the present case, the appellant has failed to show that any sort of variance exists.

■ In support of his argument, Gorman claims that the indictment stated he received $23,000 in loans from Weber, although the evidence showed he received only $13,000 from Weber, the remainder coming from loans granted by the People's Bank of McComb, Ohio. This argument,

however, shows an extremely limited view of the record. The pertinent part of the indictment alleges that Gorman "did, directly and indirectly, ... receive things of value from Merle C. Weber, that is, loans totaling $23,000...." There is ample evidence in the record indicating the loans the appellant received from the People's Bank were arranged through Weber. The proofs at trial thus adhered strictly to what was alleged in the indictment, thus rendering this assignment of error frivolous.

We therefore conclude that all of the appellant's assignments of error as to both counts of his conviction are without merit. Accordingly, the judgment of the district court is hereby AFFIRMED.