*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0003P (6th Cir.)
File Name: 00a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | | |
| *v.* | | Nos. 98-3356/ 3847/3850 |
| BENJAMIN Y. OWUSU (98-3356), LARRY LATHAM (98-3847), and ANTHONY LATHAM (98-3850), *Defendants-Appellants.* | | |

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00030—James L. Graham, District Judge.

Argued and Submitted: October 26, 1999

Decided and Filed: January 5, 2000

Before: JONES, MOORE, and GILMAN, Circuit Judges.

———————

### COUNSEL

**ARGUED:** Stephen E. Maher, Columbus, Ohio, Keith E. Golden, GOLDEN & MEIZLISH, Columbus, Ohio, for Appellants. Gary L. Spartis, OFFICE OF THE U.S.

ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:**
Paul R. Hensley, FEDERAL PUBLIC DEFENDER'S
OFFICE, Columbus, Ohio, for Appellant in 98-3356. Terry
K. Sherman, Columbus, Ohio, for Appellant in 98-3847.
Keith E. Golden, GOLDEN & MEIZLISH, Columbus, Ohio,
for Appellant in 98-3850. Gary L. Spartis, David J. Bosley,
OFFICE OF THE U.S. ATTORNEY, Columbus, Ohio, for
Appellee.

-------------------

**OPINION**

-------------------

    KAREN NELSON MOORE, Circuit Judge. This appeal
involves three individuals who were part of a conspiracy to
distribute drugs in Columbus, Ohio. Larry Latham and
Benjamin Owusu were the primary participants in the
conspiracy, and Anthony Latham was involved in the chain of
distribution. Owusu pleaded guilty to conspiracy to distribute
and cooperated with the government. After a jury trial,
Anthony and Larry Latham were convicted of several federal
drug violations.[1] Anthony appeals: (1) the district court's
refusal to grant him a mitigating role adjustment to his
offense level under U.S. SENTENCING GUIDELINES MANUAL
(U.S.S.G.) § 3B1.2; (2) the district court's calculation of the
amount of drugs attributable to him; (3) the district court's
application of an enhanced sentencing penalty for the
distribution of "crack" cocaine pursuant to U.S.S.G. § 2D1.1;
and (4) the district court's denial of his motion for a new trial
based on the government's alleged violations of 18 U.S.C.
§ 201(c)(2). We **AFFIRM** each of these district court
decisions.

    Larry's counsel raises the following issues on appeal: (1)
the district court's denial of his motion for judgment of

-------------------

[1]To avoid any confusion between Anthony and Larry Latham, we
depart from our general practice and refer to each by his first name.

acquittal of Counts 1, 2, 3, and 11 of the indictment; (2) the district court's calculation of the quantity of drugs attributable to him; (3) the district court's enhancement of his sentence for his leadership role in the conspiracy under U.S.S.G. § 3B1.1(a); and (4) the district court's enhancement of his sentence for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). In addition, Larry makes several pro se arguments. We **REVERSE** the district court's denial of Larry's motion for judgment of acquittal of Count 2 and **AFFIRM** the rest of the district court's decisions.

Finally, Owusu, who has AIDS, appeals the district court's refusal to grant a downward departure in his sentence for "an extraordinary physical impairment" under U.S.S.G. § 5H1.4. We **DISMISS** the appeal of this determination because the district court was aware of its authority to grant such a departure and thus its decision is nonreviewable.

## I. FACTS AND PROCEDURE

In 1988, Owusu and Larry decided to pool their money together to purchase cocaine from a supplier Owusu knew in New York City. They would travel to New York to buy the drugs, split the drugs evenly, and then independently distribute them in Columbus, Ohio. They were both arrested on September 5, 1988, by a New Jersey state trooper who discovered two kilograms of cocaine and two guns in the car in which they were traveling. Owusu and Larry were convicted of drug and weapons charges in New Jersey state court, sentenced to five years of imprisonment, and placed on bond pending the appeal of their convictions. They then left the state of New Jersey without ever serving their sentences; New Jersey has outstanding warrants for their arrest. Owusu and Larry were able to begin purchasing from Owusu's connection and distributing again in 1989, when Larry received a disability check for approximately $5,000. The amounts of cocaine they bought grew larger and larger over time. This arrangement continued until 1992 or 1993, when Larry and Owusu had a falling out. Larry then developed his

own connection for cocaine but still continued to receive some cocaine through Owusu.

Anthony also was involved in the conspiracy. He received powder and crack cocaine from his brother Larry and then distributed it to street-level dealers. Anthony Peoples was Larry's right-hand man in distributing drugs. Velma Broomfield was Owusu's girlfriend. She sometimes acted as a courier to transport the drugs from New York to Ohio, and also helped test, store, and distribute the drugs. Sonyini McGraw and Larry Walton were street-level distributors who received their cocaine from Larry and Anthony Latham.

Owusu, Peoples, Broomfield, McGraw, and Walton cooperated with the government and testified against Larry and Anthony at trial. A jury convicted both of them of Count 1, conspiracy to distribute and to possess with the intent to distribute over five kilograms of cocaine, over 50 grams of crack cocaine, and heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) & (iii), and 21 U.S.C. § 846. The jury also found Anthony guilty of Counts 4, 5, 7, 8, and 9, charging him with distribution of and possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). The jury concluded that Larry also was guilty of Counts 2, 3, and 11, charging him with distribution of and possession with intent to distribute heroin and crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii). The district court sentenced Anthony to 168 months of imprisonment followed by five years of supervised release. It sentenced Larry to life imprisonment on Counts 1 and 11 and to 240 months of imprisonment on Counts 2 and 3, to run concurrently with his life sentence.

Owusu pleaded guilty to Count 1 of the indictment, conspiracy to distribute and to possess with the intent to distribute over five kilograms of cocaine, over 50 grams of crack cocaine, and heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) & (iii), and 21 U.S.C. § 846.

The district court's questions and analysis were based on this court's analysis and holding in *Thomas* and show that it knew it had the authority to grant Owusu a downward departure under U.S.S.G. § 5H1.4. The district court also was aware of Owusu's medical condition, but decided in its discretion that the condition was not sufficiently severe to warrant a downward departure for an extraordinary physical impairment. Therefore, the district court's determination is not reviewable. *See United States v. Coleman,* 188 F.3d 354, 357 (6th Cir. 1999) (en banc).

### III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's decisions with respect to Anthony Latham. We **REVERSE** the district court's denial of Larry Latham's motion for judgment of acquittal of Count 2 and **REMAND** to the district court solely for the purpose of correction of the judgment to eliminate conviction of Count 2. We **AFFIRM** the rest of the district court's decisions with respect to Larry Latham. Finally, we **DISMISS** Owusu's appeal of the district court's refusal to grant a downward departure in calculating his sentence.

49 F.3d at 260-61 (quoting *United States v. DePew*, 751 F. Supp. 1195, 1199 (E.D. Va. 1990), *aff'd on other grounds*, 932 F.2d 324 (4th Cir.), *cert. denied*, 502 U.S. 873 (1991)). In *Thomas*, the court concluded that a defendant was not entitled to a downward departure for an extraordinary physical impairment because his HIV had not progressed into advanced AIDS. *See* 49 F.3d at 261. In this case, the district court judge asked Owusu and his attorney to describe Owusu's current physical limitations. Owusu complained of a skin condition, lack of energy, and confusion, while his attorney focused on his reduced life expectancy. The district court then decided that Owusu did not qualify for a downward departure based on the following reasoning:

> I'm not sure that Mr. Owusu's condition has progressed to the point where a downward departure would be legally justifiable. He does suffer from AIDS, but he is able to function in the normal prison population. He appears to be in fairly good health as he stands before the Court today. But even if his condition should constitute an extraordinary physical impairment, the Court does not feel that a departure downward would be appropriate in this case, considering the seriousness of his offense and also considering his current physical condition, which while he may have a significantly reduced life expectancy, is not one of debilitation or extreme disability at this point. He is not in the terminal stages of his disease as he stands before the Court today.

J.A. at 79-80.

In the district court's written imposition of Owusu's sentence, it again explained that Owusu's motion for this downward departure was denied because he had not yet reached a terminal stage of the disease and "there is no evidence that he is currently experiencing any significant health problems." J.A. at 46.

---

He was sentenced to 144 months of imprisonment, followed by five years of supervised release.

## II. ANALYSIS

### A. Anthony Latham

Anthony's appeal involves four different issues: (1) the district court's refusal to grant him a mitigating role adjustment to his offense level; (2) the district court's calculation of the quantity of drugs attributable to him; (3) the district court's application of an enhanced sentencing penalty for the distribution of "crack" cocaine; and (4) the district court's denial of his motion for a new trial based on the government's promises of more lenient sentences in exchange for witnesses' testimony in alleged violation of 18 U.S.C. § 201(c)(2).

#### 1. Mitigating Role Adjustment

We review a district court's denial of a mitigating role adjustment to a defendant's offense level under the Sentencing Guidelines for clear error. *See United States v. Latouf*, 132 F.3d 320, 332 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 1542 (1998).[2] Under U.S.S.G. § 3B1.2, a defendant's offense level may be decreased by two levels if he was a

---

[2] We have frequently stated that we review denials of mitigating role adjustments for clear error. *See, e.g., United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995); *United States v. DeFranco*, 30 F.3d 664, 669 (6th Cir.), *cert. denied*, 513 U.S. 942 (1994); *United States v. White*, 985 F.2d 271, 274 (6th Cir. 1993). Recently, however, in *United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997), we announced a two-part standard of review in the context of aggravating role adjustments. Under this standard, a district court's factual findings are reviewed for clear error, while a district court's legal conclusions regarding the application of U.S.S.G. § 3B1.1 to the facts are reviewed de novo. The *Gort-DiDonato* standard seems equally appropriate for mitigating role adjustments as it is for aggravating role adjustments. Since we would affirm the district court under either standard, we need not resolve this matter today.

"minor participant in any criminal activity." To qualify for this reduction, a defendant must be "'less culpable than most other participants'" and "'substantially less culpable than the average participant.'" *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993) (quoting U.S.S.G. § 3B1.2 commentary, applic. note 3 & background), *cert. denied*, 511 U.S. 1043 (1994). This determination is "'heavily dependent upon the facts,'" and the defendant must prove a mitigating role by a preponderance of the evidence. *Id.*

Anthony argues that he is substantially less culpable than the other participants in the conspiracy because he was only an end user of drugs who occasionally supplemented his income by selling drugs to others and was no more culpable than the unindicted street-level dealers involved in a conspiracy. The sentencing court agreed that Anthony was less culpable than the primary coconspirators, Larry and Owusu. Comparing his activities to all of the people who participated in the conspiracy's illegal activity, however, the court concluded that Anthony was more culpable than the street-level dealers because he was at a higher level in the chain of distribution. Sonyini McGraw testified that Larry supplied drugs to Anthony, who then distributed them to McGraw to sell at a crack house in 1988 and 1989. McGraw also testified that after he was released from jail in 1993 and wanted to begin selling drugs on the street again, Anthony "fronted" him for several months by supplying him with approximately an ounce of crack per week, which Anthony had obtained from Larry.

Anthony argues that he was in jail in 1988 and 1989 and thus could not have been selling drugs to McGraw at that time. Anthony testified before the sentencing court, however, that he was out of jail for over two months in 1988 and nine months in 1989. Anthony also argues that McGraw's entire testimony is suspect because the sentencing court concluded that part of McGraw's testimony -- where he saw Larry give Anthony approximately 500 grams of cocaine in a pizza box in the pizza store located next door to Anthony's barbershop

## C.  Benjamin Owusu

Owusu appeals the district court's denial of his motion for a downward departure of his sentence for "an extraordinary physical impairment" under U.S.S.G. § 5H1.4. A defendant may appeal his sentence if it was "imposed in violation of law" or "imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(a)(1)-(2). Ordinarily, however, a court's refusal to exercise its discretion and grant a downward departure is not reviewable. *See United States v. Landers*, 39 F.3d 643, 649 (6th Cir. 1994). We may review a denial of a downward departure only if the district court incorrectly believed it lacked the authority to grant such a departure as a matter of law. *See United States v. Coleman,* 188 F.3d 354, 357 (6th Cir. 1999) (en banc). A district court judge has no duty "to state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so." *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). Moreover, "an appellate court should be reluctant to 'treat as ambiguous' a ruling which does not affirmatively state that the judge knew he could depart downward but failed to do so." *Id.* (quoting *United States v. Barrera-Barron*, 996 F.2d 244, 245 (10th Cir.), *cert. denied*, 510 U.S. 937 (1993)). We should therefore assume that a district court is exercising its proper discretion when it concludes that a downward departure is unwarranted. *See id.*

Based on the record, the district court understood that it had the authority to grant Owusu a downward departure under U.S.S.G. § 5H1.4. Owusu filed a sentencing memorandum with the district court requesting a departure under this provision, citing to the most relevant and controlling Sixth Circuit case, *United States v. Thomas*, 49 F.3d 253 (6th Cir. 1995), and attaching a letter from a physician describing Owusu's medical condition. During the sentencing hearing, the district court judge discussed the *Thomas* decision and its adoption of a Virginia district court's analysis and conclusion that AIDS alone is not an extraordinary physical impairment under U.S.S.G. § 5H1.4. J.A. at 78-79 (discussing *Thomas*,

guns were found in the car along with the cocaine, and a rational fact finder could conclude that Larry was aware of their presence. Therefore, Owusu's possession would be reasonably foreseeable to Larry and could be imputed to him. Under these circumstances, the district court did not clearly err in adding two points to Larry's base offense level for possession of a firearm under U.S.S.G. § 2D1.1(b)(1).

### 5. Pro Se Arguments

Finally, Larry filed a supplemental pro se brief claiming: (1) his due process right to a fair trial was violated by the district court's treatment of his counsel and its denial of his motion for mistrial; (2) the prosecution improperly vouched for the credibility of its witnesses in its closing statement; (3) the district court's jury instructions regarding conspiracy were erroneous; and (4) the government did not prove that Larry distributed "crack" cocaine in Count 11 under U.S.S.G. § 2D1.1. We have carefully reviewed the record and conclude that Larry's due process right to a fair trial was not violated because he did not identify any district court errors that prejudiced his substantial rights. In addition, we find that the government did not commit reversible prosecutorial misconduct because any comments which could be construed as improper vouching for a witness were not flagrant, the government provided significant evidence of Larry's guilt, and Larry failed to object to the comments at trial. We also hold that the district court properly gave a multiple-conspiracy jury instruction because a jury could have decided that more than one conspiracy existed since Larry worked with Owusu and also developed his own drug connection in 1992 and 1993 after he had a falling out with Owusu. Finally, Larry's argument that the government did not prove that he was involved in the distribution of "crack" in accordance with the Sentencing Guidelines must fail because the district court did not hold Larry accountable for any crack cocaine in calculating his sentence.

in 1993 -- was not a sufficient basis to attribute drugs to Anthony. The district court reasoned that McGraw's testimony was unclear as to the exact amount of drugs involved and whether the transaction involved powder or crack cocaine. The court did not, however, conclude that McGraw was lying about the events. Rather, the district court determined that McGraw was a "very significant witness." J.A. at 663. It found his testimony credible, noting that

> McGraw identified various people that he purchased drugs from. He didn't lay all of the blame on Tony Latham by any means. I can't see any reason why he would have made up the part about Tony. It's consistent with the testimony of other witnesses about Tony's involvement in distributing drugs for Larry. It's consistent with what we know about the facts that Tony Latham did distribute drugs from the barbershop or from the pizza shop next door.

J.A. at 708-09. McGraw's testimony is consistent with other testimony describing Anthony's role in the conspiracy. Larry Walton testified that from 1993 to 1995 he would buy a quarter or half an ounce of crack two or three times a week from Anthony, which Walton then would sell on the street. In addition, Anthony Peoples testified that Larry gave him powder and crack cocaine to give to Anthony Latham on several different occasions.

Although Anthony was less culpable than the primary coconspirators, Larry and Owusu, he was not less culpable than the other participants or substantially less culpable than the average participant in the conspiracy. The evidence shows that he was more than an end user and occasional street-level seller of drugs. Anthony obtained powder and crack cocaine from his brother Larry and then actively sold it to McGraw and Walton, street-level suppliers, on a regular basis. Therefore, the sentencing court did not err in refusing to apply a mitigating role adjustment to his offense level under U.S.S.G. § 3B1.2.

## 2. Quantity of Drugs Involved

We review for clear error a sentencing court's calculation of the quantity of drugs for which a defendant is accountable. *See United States v. Berry*, 90 F.3d 148, 152 (6th Cir.), *cert. denied*, 519 U.S. 999 (1996). A sentencing court may hold a defendant accountable for a specific amount of drugs only if the defendant is more likely than not responsible for a quantity greater than or equal to that amount. *See United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.), *cert. denied*, 498 U.S. 906 (1990). If the exact amount of drugs involved is uncertain, the court may make an estimate supported by competent evidence in the record. *See United States v. Ward*, 68 F.3d 146, 149 (6th Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996). The evidence "'must have a minimal level of reliability beyond mere allegation,'" and the court should err on the side of caution in making its estimate. *See United States v. Baro*, 15 F.3d 563, 569 (6th Cir.) (quoting *United States v. West*, 948 F.2d 1042, 1045 (6th Cir. 1991)), *cert. denied*, 513 U.S. 912 (1994). Testimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable. *See United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 846 (1999). We defer to a district court's credibility determinations unless they have no foundation. *See id.*

The district court held Anthony accountable for 195 grams of crack cocaine, resulting in a base offense level of 34. Anthony argues that the district court should not have included 56.7 grams of crack cocaine in that total amount because it was based on unreliable testimony from McGraw. McGraw testified that Anthony sold him an "eighth of a key, 2 ounces" of crack cocaine to sell at a crack house several different times in 1988 and 1989. J.A. at 326. McGraw also testified that Anthony "fronted" him by supplying him with an ounce of crack "every week or so" for two to three months in 1993. J.A. at 335-36. Anthony makes the same arguments here as in the previous section challenging the credibility of

weapon in a gym bag in the trunk. Larry claims this enhancement was improper because Owusu was in exclusive possession and control of the .32 caliber gun found under his seat. The gun was registered to Owusu's sister, and Larry asserts that Owusu had secreted himself on the floor of the back seat to have access to the gun while Larry was sitting passively in the front passenger seat during the stop. The New Jersey state trooper testified, however, that he saw the front seat passenger, Larry, make a furtive movement as the car was pulling over, in which he appeared to be leaning back and then forward and then back as if he was reaching into the back seat and "either hiding something or retrieving something." J.A. at 110. This evidence strongly suggests Larry placed or helped place the gun beneath his seat and thus had control and constructive possession over the gun.

In addition, in *United States v. Duncan*, 918 F.2d 647, 651 (6th Cir. 1990), *cert. denied*, 500 U.S. 933 (1991), the court reviewed the case law in this and other circuits and concluded, "The cases are all consistent in that they recognize that enhancement is appropriate if a weapon is found . . . in the automobile that facilitated the drug transaction." In that case, possession was found when a gun was located on the front passenger seat of the defendant's car during drug sales carried out in and about the car. When Larry and Owusu were stopped by the state troopers, they were returning to Ohio from New York where they had purchased two kilograms of cocaine they were planning to sell in Columbus as part of their conspiracy to distribute drugs. Because the guns were found in the car facilitating their conspiracy, the district court could have found Larry had constructive possession of the guns during this offense. Moreover, even if the weapons were in Owusu's exclusive possession, this possession occurred in connection with the conspiracy between Larry and Owusu to distribute drugs. We have held that where a defendant knew his coconspirator was trafficking drugs with a gun in the car, possession was reasonably foreseeable and could be imputed to him. *See United States v. Perkins*, 994 F.2d 1184, 1192 (6th Cir.), *cert. denied*, 510 U.S. 903 (1993). Here, the two

than five individuals, the district court did not err in concluding that Larry's offense level should be increased by four levels under U.S.S.G. § 3B1.1(a).

### 4. Possession of a Firearm

We review a district court's factual finding of possession of a firearm for enhancement of a defendant's sentence under U.S.S.G. § 2D1.1(b)(1) for clear error. *See United States v. Elder*, 90 F.3d 1110, 1133 (6th Cir.), *cert. denied*, 519 U.S. 1016 (1996). The Sentencing Guidelines provide that the base offense level of a defendant convicted of a drug offense should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). This enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 commentary, applic. note 3. The government must prove by a preponderance of the evidence that "(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir.), *cert. denied*, 519 U.S. 858 (1996). Constructive possession may be established if the defendant has ownership, dominion, or control over the weapon. *See id.* If the offense committed is part of a conspiracy, however, the government does not have to prove that the defendant actually possessed the weapon, but instead may establish that a member of the conspiracy possessed the firearm and that the member's possession was reasonably foreseeable by other members in the conspiracy. *See United States v. Sanchez*, 928 F.2d 1450, 1459 (6th Cir. 1991).

The district court enhanced Larry's sentence under this provision because Larry, Owusu, and Kevin Ardister were arrested on September 5, 1988, in connection with a traffic stop by a New Jersey state trooper who found a .32 caliber semi-automatic pistol under the front passenger seat of their car and two kilograms of cocaine and another semi-automatic

McGraw's testimony. As discussed in Part II.A.1 *supra*, these arguments must be rejected. Moreover, the district court's determination that McGraw's testimony was credible is not without foundation because McGraw had no reason to single Anthony out for these transactions and because his testimony regarding Anthony's activities was consistent with other testimony in the record. Based on this specific evidence, the sentencing court properly erred on the side of caution and estimated that Anthony should be held accountable for only two ounces of crack cocaine, or 56.7 grams. Therefore, it was not clear error to include the 56.7 grams of crack cocaine in his total attributed amount of 195 grams.

### 3. Determination that Drugs Were Crack Cocaine

Anthony also argues that the district court incorrectly determined that the drugs attributable to him were "crack" when it applied the enhanced penalty associated with this form of cocaine base under the Sentencing Guidelines. At sentencing, the government has the burden of proving by a preponderance of the evidence that the drugs involved were the "crack" form of cocaine base, as defined under U.S.S.G. § 2D1.1. *See United States v. Jones*, 159 F.3d 969, 981-82 (6th Cir. 1998). Whether a drug is crack or another form of cocaine base is a question of fact for the sentencing court to determine, which we review for clear error. *See id.* at 982. Although neither party has addressed this issue, it appears that Anthony did not specifically contest the type of drugs attributed to him before the district court. Therefore, this argument is reviewed for plain error. *See* FED. R. CRIM. P. 52 (b). The plain error analysis has four steps:

First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule

52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993), *cert. denied*, 511 U.S. 1043 (1994).

According to § 2D1.1, "'Cocaine base,' for the purposes of this guideline, means 'crack.' 'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1(c) note D. Anthony argues that because the government did not prove that the drugs attributable to him were actually processed with sodium bicarbonate, they should not be considered "crack" under this provision. We have expressly held, however, that the use of sodium bicarbonate is not a necessary prerequisite for a district court's factual determination that a particular drug is "crack." *See Jones*, 159 F.3d at 982-83. This provision "does not attempt to define crack as being manufactured in any particular way. The definition, through the use of the word 'usually,' serves merely to illustrate a common method of conversion." *Id.* at 982. Thus, the government was not required to prove that the crack cocaine for which Anthony was held accountable was manufactured with sodium bicarbonate.

A preponderance of the evidence supports the district court's finding that the drugs attributed to Anthony were the crack form of cocaine base. Part of the attributed drugs came from purchases an undercover police agent and informant made from Anthony on several different occasions in June, July, and October 1994 and from seizures made in connection with Anthony's arrest in October 1994. A police analyst testified that she performed laboratory tests on the drugs purchased and seized from Anthony and concluded that they were cocaine base. It is important to note that this testimony did not establish that these drugs were in fact the crack form

began receiving anywhere from ten to twenty-five kilograms of cocaine per month from this new source.

This evidence shows that Larry and Owusu were both leaders of this drug conspiracy. Although Owusu initially had the drug connection, they shared decisionmaking authority. In 1988, they jointly decided to pool their money together to purchase the cocaine in New York. Larry supplied the entire amount of money in 1989 to start up the distribution again after they were arrested in New Jersey in 1988. They jointly arranged the trips to New York to obtain the drugs, and Larry had his car customized to have secret compartments in which the drugs could be hidden for these trips. Once Larry and Owusu obtained the cocaine, they would split it evenly and each would distribute his half independently. Larry directed Peoples and McGraw in distributing his share of the cocaine. In a similar factual situation, we upheld a district court's finding that a defendant was a leader or organizer where he had an equal role with two other individuals in providing drugs to several dealers and a gang, where the defendant's activities included determining when to order the drugs, contacting a supplier in New York, negotiating a price, and arranging couriers to transport the drugs from New York back to Ohio. *See United States v. Bingham*, 81 F.3d 617, 629-30 (6th Cir.), *cert. denied*, 519 U.S. 900 (1996). Like the coconspirators in *Bingham*, Larry was an organizer or leader of the conspiracy.

Larry argues that because Peoples was the only individual he could have arguably led or directed, he was not leading five individuals. It is not necessary, however, for a defendant to have led or directed five individuals to receive this sentencing enhancement. It may apply "[i]f the defendant organized or led at least one participant, and if the activity involved five or more people or was otherwise extensive." *Ward*, 68 F.3d at 151. In this case, the drug conspiracy involved more than five participants, including Owusu, Larry, Anthony, McGraw, Peoples, and Broomfield. Because Larry was an organizer or leader of a conspiracy involving more

seized in New Jersey in September 1988, Larry and Owusu were out of money and drugs and had to start all over again. In 1989, Larry received a disability check for approximately $5,000, which he gave to Owusu, who traveled to New York to purchase a quarter of a kilogram of cocaine. Starting in 1989, they would use Velma Broomfield as a courier. Up until 1992, they would pool their money and split the cocaine from New York, never disclosing to each other to whom they were distributing their share. As discussed in Part II.B.2 *supra*, Larry and Owusu purchased and distributed a minimum of 150 kilograms of cocaine.

The government presented evidence that Larry had individuals distributing cocaine for him. McGraw testified that Larry supplied him with crack cocaine to sell on the street and then arranged for him to sell the drugs out of a crack house in which Larry's mother had once lived. Larry also supplied crack to the other sellers working out of the crack house every day or every other day. McGraw would receive drugs from Larry through Anthony and through Peoples. He testified that for approximately five years, Larry and Peoples were together all of the time and that Peoples was Larry's right-hand man. During this time period, when McGraw wanted to purchase drugs, he would talk to Larry and then would obtain the drugs from Peoples.

Peoples also testified that he was Larry's right-hand man. He and Larry would cook cocaine into crack for distribution. Peoples would do the actual distributing, based on who Larry told him to go and see. They sold to low-level dealers in their public housing project and in other places. On several different occasions, Larry asked Peoples to deliver drugs to Anthony. Peoples also testified that to assist in the conspiracy's efforts, Larry built hidden compartments into his car to hide the drugs from New York, bought a vacuum-seal machine to seal the drugs they packaged, and bought a money-counting machine. He also stated that in 1993, Larry developed another connection, in addition to Owusu, and

of cocaine base as required by *Jones*. The government, however, provided additional evidence that the drugs were crack. The police agents who had purchased and seized the drugs from Anthony testified that they had performed field tests on the drugs which revealed that they were crack cocaine. In addition, the drugs were admitted into evidence at trial and a police agent described them as having an opaque, rock-like appearance, a characteristic of crack cocaine.[3] The government may rely on police laboratory results and testimony from field agents to establish that seized cocaine is crack cocaine. *See Jones,* 159 F.3d at 982 (affirming the district court's determination that the drugs involved were crack cocaine based on testimony from a forensic scientist, a police field agent, and taped conversations referring to crack). In addition, evidence that the cocaine is in rock form indicates that the substance is in fact crack cocaine. *See Wright v. United States*, 182 F.3d 458, 468 (6th Cir. 1999) (affirming district court's conclusion that drugs were crack based in part on testimony that the seized drugs were a "'chunky hard substance,'" a characteristic of crack cocaine). Therefore, the district court did not err in concluding the drugs purchased and seized from Anthony by the police were crack cocaine.

Anthony alleges that the rest of the crack cocaine, which is attributed to him based on transactions described in McGraw's testimony, cannot conclusively be determined to be crack. The government may establish the identity of a drug by circumstantial evidence. *See United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir.), *cert. denied*, 512 U.S. 1243 (1994). Expert testimony is not necessary, and a lay witness who has personal experience with crack cocaine can establish that a substance is crack. *See id.* at 1439-40 (affirming the district court's finding that the substance involved was crack

---

[3]The drugs from one purchase, executed on July 14, 1994, were accidentally destroyed. The police agent testified, however, that he had examined them and concluded that they were in fact crack cocaine.

cocaine based on testimony from several government witnesses who had seen the defendant "cutting" crack or had seen the substance and knew it was crack based on their personal experience). In this case, McGraw specifically testified that Anthony sold him the crack form of cocaine base in 1988 and 1989. He also testified that Anthony supplied him with crack cocaine for several months in 1993. McGraw appears to have based his conclusions that these transactions involved crack on his personal experience. He had observed Larry cook crack cocaine on several different occasions in 1989, 1990, and 1994, and therefore could differentiate crack from other forms of cocaine base. Because McGraw had sufficient experience to make this determination, the district court did not err in relying on this testimony to conclude that the drugs Anthony sold McGraw were crack under U.S.S.G. § 2D1.1.

### 4. 18 U.S.C. § 201(c)(2)

Finally, Anthony argues that the district court should have granted him a new trial because the government allegedly violated 18 U.S.C. § 201(c)(2). He relies on *United States v. Singleton*, 144 F.3d 1343, 1350-51 (10th Cir. 1998), which held that the government violates this provision when it impermissibly promises witnesses something of value, such as a more lenient sentence, in exchange for testimony. This decision, however, was vacated and reversed by the Tenth Circuit in an en banc decision. *See United States v. Singleton*, 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied*, 119 S. Ct. 2371 (1999). Moreover, we expressly rejected this analysis and holding in *United States v. Ware*, 161 F.3d 414, 419-24 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 1348 (1999) (holding that this provision does not apply to the government based on a thorough examination of canons of statutory construction, historical practice, the prosecutor's established prerogatives, and legislative history). Because 18 U.S.C. § 201(c)(2) does not apply to the government, Anthony's argument must be rejected.

review. *See United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997). Under the Sentencing Guidelines, a defendant's offense level may be increased by four levels if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the court concludes that "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," it may increase his offense level by three levels. U.S.S.G. § 3B1.1(b). A court should consider the following factors in making its determination:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 commentary, applic. note 4. The government must prove this finding by a preponderance of the evidence. *See United States v. Ward*, 68 F.3d 146, 151 (6th Cir. 1995), *cert. denied,* 516 U.S. 1151 (1996).

The district court concluded that Larry was the organizer or leader of this conspiracy, which involved over five people and was extensive. The conspiracy began in 1988 when Owusu told Larry that he had a cocaine supplier in New York and they agreed to pool together $150 to purchase cocaine. In the beginning, they traveled together to New York to obtain the drugs and then each took half to sell on their own once they were back in Ohio. With their profits, they continued to pool their money together to purchase increasing amounts of cocaine. After they were arrested and their cocaine was

two kilograms of cocaine. In 1989, they began purchasing in New York again starting with a quarter of a kilogram of cocaine. They worked up to five to seven kilograms of cocaine within approximately six months. For approximately one year they purchased five to seven kilograms in New York twice a month. In 1991 and 1992, they were buying five to ten kilograms of cocaine twice a month. Owusu also testified that Larry would receive one to three kilograms of cocaine per week in 1993 and 1994. Based on this testimony, 150 kilograms is a conservative estimate for the amount of cocaine distributed through this conspiracy.

Larry argues that this testimony is not credible because it is vague. Testimony from Peoples, McGraw, Velma Broomfield, and Derrick Russell, however, provided similar evidence of large amounts of cocaine attributable to Larry through the conspiracy. Peoples, for instance, testified that in 1988 Larry and Owusu had worked up to purchasing five to ten kilograms every couple of weeks and they were purchasing ten to fifteen kilograms three to four times a month in 1989 and 1990. This testimony also establishes more than 150 kilograms of cocaine for which Larry could be held accountable. Larry also argues that this testimony is tainted because the witnesses expected to receive more lenient sentences in exchange for their cooperation in violation of 18 U.S.C. § 201(c)(2). As already discussed in Parts II.A.4, II.B.1.a, and II.B.1.d *supra*, this argument must be rejected. Larry has not identified any other reason to find that the sentencing court lacked foundation in concluding Owusu's testimony was credible. Therefore, the district court did not clearly err in holding Larry accountable for 150 kilograms of cocaine.

### 3. Leadership Role

We review a sentencing court's factual findings regarding a defendant's role in a conspiracy for clear error. Whether these facts warrant a sentence enhancement pursuant to U.S.S.G. § 3B1.1(a) is a legal conclusion subject to de novo

### B. Larry Latham

Larry's counsel raises the following issues on appeal: (1) the district court's denial of his motion for judgment of acquittal of Counts 1, 2, 3, and 11 of the indictment; (2) the district court's calculation of the quantity of drugs attributable to him; (3) the district court's enhancement of his sentence for his leadership role in the conspiracy under U.S.S.G. § 3B1.1(a); and (4) the district court's enhancement of his sentence for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). Larry makes several additional arguments in his supplemental pro se brief.

### 1. Motion for Judgment of Acquittal of Counts 1, 2, 3, and 11

Larry claims the district court improperly denied his motion for judgment of acquittal of Counts 1, 2, 3, and 11 pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.[4] We review a district court's denial of a motion for judgment of acquittal on the basis of insufficient evidence by examining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Gorman*, 807 F.2d 1299, 1303 (6th Cir. 1986), *cert. denied*, 484 U.S. 815 (1987). This review is "quite limited." *United States v. Morrow*, 977 F.2d 222, 230

---

[4]Larry's attorney properly made a Rule 29 motion following the close of all evidence with respect to Counts 1, 2, 3, and 11, which the district court denied. This motion was not renewed within seven days of the jury verdict as allowed under Rule 29. *See* Fed. R. Crim. P. 29(c). Before sentencing, Larry filed a motion for leave to file a motion for judgment of acquittal based on the Tenth Circuit's *Singleton* decision. The district court denied the motion for leave because grounds existed upon which Larry could have renewed his motion within the proper time frame. Assuming arguendo that the court did grant leave, it still would have dismissed a Rule 29 motion based on *Singleton* because it concluded that the decision was contrary to existing Sixth Circuit law.

(6th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 975 (1993). This court does not weigh evidence, make credibility determinations, or substitute its judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993), *cert. denied*, 510 U.S. 1130 (1994).

### a. Count 1

Larry claims the government did not submit sufficient evidence that he was involved in a conspiracy to possess with intent to distribute over five kilograms of cocaine, 50 grams of crack cocaine, and heroin under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) & (iii), and 21 U.S.C. § 846. The government's only evidence of conspiracy, he asserts, was provided by individuals who had been charged with or convicted of federal drug offenses and who testified in expectation of a more lenient sentence. Larry argues that because the government's actions violate 18 U.S.C. § 201(c)(2), this testimony should be excluded under *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998). As discussed in Part II.A.4 *supra* in response to a similar argument by Anthony, the *Singleton* decision was vacated and reversed by the Tenth Circuit, and we have expressly rejected its analysis and holding. *See United States v. Ware*, 161 F.3d 414, 419-24 (6th Cir. 1998), *cert. denied*, 119 S. Ct. 1348 (1999); *see also United States v. Singleton*, 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied*, 119 S. Ct. 2371 (1999). Therefore, the district court properly denied Larry's motion for judgment of acquittal of Count 1 on this basis.

### b. Count 2

Larry asserts that the government failed to present sufficient evidence to support Count 2, that he was involved in a sale of heroin on April 17, 1992, in violation of 21 U.S.C. § 841(a)(1). Police Detective Enoch White testified that he was working undercover with an informant at that time, and they went to a house on Miami Avenue to buy drugs from Larry. They were waiting in a front room of the house for

properly denied Larry's motion for judgment of acquittal of Count 11.

### 2. Quantity of Drugs Involved

We review a sentencing court's calculation of the quantity of drugs for which a defendant is accountable for clear error. *See United States v. Berry*, 90 F.3d 148, 152 (6th Cir.), *cert. denied*, 519 U.S. 999 (1996). Under the Sentencing Guidelines, "a defendant is accountable for all quantities of drugs with which he was directly involved and, in the case of joint criminal activity, all reasonably foreseeable quantities." *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir.), *cert. denied*, 513 U.S. 942 (1994). *See also* U.S.S.G. § 1B1.3(a)(1). The government must prove the quantity by a preponderance of the evidence. *See United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.), *cert. denied*, 498 U.S. 906 (1990). As we explained in Part II.A.2 *supra*, if the exact amount of drugs involved is uncertain, the court may make an estimate supported by competent evidence in the record.

Larry argues that the district court erred in relying exclusively on Owusu's testimony in holding him accountable for over 150 kilograms of cocaine. At sentencing, the district court reviewed all of the evidence, including the amount of drugs attributable from the testimony provided by the various witnesses. In actually calculating Larry's offense level, the court only considered the drugs referred to in Owusu's testimony because that quantity already exceeded 150 kilograms of cocaine, which corresponds to the highest base offense level in the Sentencing Guidelines. The sentencing court concluded that Owusu was "a very credible witness" before relying on his testimony for this purpose. J.A. at 654. Owusu testified that he and Larry began in early 1988 by purchasing a quarter of a kilogram of cocaine in New York and then bringing it back to Ohio for distribution. They continued by purchasing a half of a kilogram, then one kilogram, and quickly moved up to two kilograms. On September 5, 1988, they were arrested in New Jersey with

eventually met up with him at Peoples's grandmother's house. Once they arrived at the house, Peoples went directly to the kitchen where Larry was sitting at the kitchen table. Wilson followed him, but Larry and Peoples told him not to come into the kitchen. Wilson stood in the adjoining living room but could see part of the kitchen through a reflection from a mirror and observed Peoples walking toward Larry. Peoples then left the kitchen and asked Wilson to go out to the front porch of the house with him. Peoples told Wilson how much money Larry wanted for the crack cocaine, they haggled over the price, Peoples took the money inside the house, and then Peoples returned to the porch with 57 grams of crack.

Larry argues that Wilson's testimony does not establish that Larry was involved in this transaction because the crack cocaine was purchased from Peoples on the porch of the house without Larry present. Although Wilson saw Peoples walking toward Larry, he did not see any drugs being exchanged between them. In addition, Larry also questions the credibility of Wilson's testimony. However, we do not make credibility determinations in evaluating the sufficiency of evidence. *See Hilliard*, 11 F.3d at 620. Moreover, Wilson's testimony was corroborated and supplemented by Peoples's testimony. Peoples testified that on the night of October 27, 1994, he met with Larry in the kitchen of his grandmother's house, and Larry gave him a couple of ounces of crack cocaine. Peoples then sold the crack to Wilson on the front porch of the house and gave the money to Larry. Larry argues that Peoples's testimony should be excluded because it was provided in expectation of a more lenient sentence in violation of 18 U.S.C. § 201(c)(2). As discussed in Parts II.A.4 and II.B.1.a *supra*, this is not a valid argument.

Taken together, the testimony from Wilson and Peoples provides sufficient evidence upon which a rational juror could conclude beyond a reasonable doubt that Larry was directly involved in the sale of 57 grams of crack cocaine to White on October 27, 1994, satisfying the elements of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). The district court thus

Larry to arrive for approximately twenty minutes when a white automobile pulled up to the front of the house. Larry and another man, Charles Smith, stepped out of the car and walked directly to the kitchen area located in the back of the house. The informant then went to the back of the house, while White remained in the front room. The informant returned to the front room with Smith, who was holding one gram of heroin. Smith gave the heroin to the informant, who gave it to White. White paid Smith $500 in cash, talked about possible future deals, and then Smith returned to the back area of the house. White admits that Larry never came to the front of the house and that he only dealt with Smith and the informant during this transaction.

Larry argues that this evidence is not sufficient to establish that he was involved in this sale of heroin because White never saw Larry with any drugs and did not have any direct contact with him. The applicable statute states, "it shall be unlawful for any person knowingly or intentionally — (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). The government appears to argue that Larry remained in the kitchen while Smith carried out the transaction on his behalf by bringing the drugs from the kitchen and then taking the money back to him, and, therefore, Larry knowingly and intentionally distributed drugs to White. The government did not, however, submit any additional evidence to support this argument, to prove that Larry was actually involved in this deal, or to show that he routinely had Smith carry out his transactions. Because sufficient evidence did not exist from which a rational juror could conclude beyond a reasonable doubt that Larry was guilty of this offense, the district court erred in denying his motion for judgment of acquittal of Count 2. Therefore, we reverse the district court's denial of Larry's motion for judgment of acquittal of Count 2.

#### c.  Count 3

Larry also claims the government presented insufficient evidence to find him guilty of Count 3, distribution of heroin on May 7, 1992, in violation of 21 U.S.C. § 841(a)(1). Detective White testified that he went to the informant's house at 62 North Waverly on that date to purchase drugs. He arrived at the house at the same time as Larry and two other individuals. White went inside to the front area of the house, while Larry and the informant went to the kitchen area for approximately three or four minutes. White was then called to the kitchen area and asked to show that he had $1,000 cash to purchase two grams of heroin. After displaying the money, Larry told White that he did not have the drugs on him and had to go get them. Larry left the house and was gone for approximately ten minutes. When Larry returned, he went to the kitchen area while White remained in the front room. White was able to see what was happening in the kitchen through a reflection from the front of the microwave, and he observed Larry pulling something out of his pocket. Five minutes later, White was called into the kitchen and a package containing two grams of heroin was on the kitchen table. White picked it up and put the money on the table, as instructed by Larry. He did not see Larry pick up the money. White then went upstairs with the informant, who gave him an ounce of heroin which was to be "fronted" to him by Larry. White never ended up paying Larry for this "fronted" heroin, even though he attempted to do so on several occasions.

Larry argues that White's testimony is not sufficient for a rational fact finder to conclude that he sold the heroin to White because White only saw a package of heroin on the table and never actually saw Larry with the drugs. However, Larry told White he could get heroin for him and departed for ten minutes. White saw Larry pull something out of his pocket, and then a package of heroin was on the table, which Larry allowed White to take once he put his money on the table. This is sufficient evidence upon which a rational juror could find beyond a reasonable doubt that Larry knowingly

and intentionally distributed the heroin to White. With respect to the "fronted" heroin, the informant gave it to White when they were alone upstairs, out of Larry's presence. White did not have any further contact with Larry after that night, and Larry never accepted payment for this heroin because he claims he was not involved in that transaction. White testified that the heroin was fronted by Larry, but White did not explain this assertion any further, and the government did not produce any other evidence to support it. Because Larry cannot be tied to this heroin, there was insufficient evidence for any rational fact finder to conclude that Larry knowingly and intentionally distributed this "fronted" heroin. Therefore, the district court should have granted Larry's motion for judgment of acquittal regarding the "fronted" heroin in Count 3. Because there was sufficient evidence for the first transaction, this is harmless error and Larry's conviction of this count is not vacated. *See* FED. R. CRIM. P. 52(a). In addition, no heroin was included in Larry's base offense level for sentencing purposes because he had already reached the highest offense level under the Sentencing Guidelines on the basis of cocaine attributable to him through the conspiracy offense. Therefore, it is unnecessary to remand the case for resentencing for any heroin improperly attributed to him under Counts 2 and 3.

#### d.  Count 11

Larry also argues that the government submitted insufficient evidence of Count 11, that he distributed more than 50 grams of crack cocaine on October 27, 1994, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Federal agent Paris Wilson testified that he went undercover and befriended a man named Hyman Dixon, who helped make arrangements for him to purchase drugs from different individuals, including Anthony Peoples. On October 27, 1994, Dixon told Peoples that Wilson wanted to purchase an eighth of a kilogram of crack cocaine, and Peoples said he would have to obtain that amount from Larry. Wilson and Peoples made several attempts to get in touch with Larry and